Gayle Anne RENEGAR, Appellant,

v.

Bill A. CRAMER, Appellee.

No. 10912.

Court of Civil Appeals of Texas.

Austin.

Filed Feb. 7, 1962.

Rehearing Denied Feb. 28, 1962.

Rogan B. Giles, Gay & Meyers, Austin, for appellant.

Vandygriff, Presnal & Baker, Byrd, Davis & Eisenberg, Marion S. Roberts, Jr., Austin, for appellee.

HUGHES, Justice.

Bill A. Cramer, suing in behalf of his wife, Patty Cramer, recovered judgment against Gayle Anne Renegar for $30,191.35 as damages for personal injuries sustained by Mrs. Cramer in a collision between a Chevrolet Sedan automobile operated by Mrs. Cramer and a Ford Thunderbird automobile operated by Gayle Anne Renegar. The collision occurred at the intersection of West 49½ Street and Finley Drive in Austin, Texas, about 11:00 A.M. on December 5, 1959. At such time, Gayle Anne Renegar was fourteen and one half years of age. The trial was to a jury.

Appellant's first and second points complain of the jury argument of appellee's counsel. They are jointly briefed and we will dispose of them in the same manner.

As to point 1 appellant's bill of exception shows that counsel for appellee made this argument to the jury:

"* * * Now, there are lots of things—some things we'd like to tell you here, but the rules do not permit. So when you get in your Jury Room, don't speculate about why we didn't tell

you about this or why this and that wasn't mentioned. Just restrict it to what the Judge tells you, what you've heard here, so that your verdict will be solid and good and they can't come back and set it aside and make us try it again. If anyone should mention anything like that out of the record, just caution them, 'We're not supposed to do it.' Just follow the Court's orders and give these answers on the basis of the evidence. The Court tells you on Page 1, 'Don't concern yourselves with the result of your answers insofar as they may result in a judgment in favor of or against either party.' Of course, the Court is telling you not to be concerned with the actual effect of your answers, nor with who is actually going to pay your verdict or whether or not it will ever be paid. Just find the facts from what you've heard here and let the Judge decide the law."

This bill was approved by the Court with these qualifications:

" * * * no objection to the statements quoted above was made; the Court was not requested to instruct the jury not to consider such statements; no complaint of any nature about such statements was made until the filing of defendant's motion for a new trial; and all of the above quoted statements were made by plaintiff's counsel in his closing argument."

Related to the second point, appellant's bill of exception shows that counsel for appellee made this argument to the jury:

"Now, I'd like to go through the problems that they raised, one by one. First, this prior injury. If they are successful in making any ground for this release thing, then any time a person is injured in an automobile collision or any other way, if he can't settle and get a fair settlement for his injuries and he has to bring a lawsuit, he's going to be a fraud, a fake and a liar, and that's what they've made out here, and any-body that comes in that they don't agree with is a fraud, a fake and a liar. In this case, I guess it's me, Dr. LaLonde and the Plaintiff also, according to what I've heard in the argument here. Any time any one of you or any member of your family or any person in society has a bent fender and is paid the amount of his property damage, it doesn't matter if he got a scratch or his daughter got a scratch, and he signs his name to one of these releases for $320.00, if that's the amount of your property damage—in this case fifty for the little girl—you're, according to their theory, forbidden forever to come in and say that your injuries were caused by this recent accident, because you put your name on this release that these boys signed up—typed out for you. Any person who has ever had property damage to his car is going to be in the same fix, if you're ever seriously injured in a wreck and have to make claim for it because you can't get a reasonable settlement. And if you don't think a simple telephone call to the central headquarters of these gentlemen will cough up every release you've ever signed, just try it. One call and give the name and they've got every release for property damage, and they can twist it and distort it, as has been done in this case. And, don't you think, just common sense, if Mrs. Cramer had really made any indication she was injured at all, don't you think they would have had in that file some medicals or statements or something besides a simple little signing of her name? If they'd had it, don't you know they would have brought it in here? They brought in what they could for poison. Spray the air with poison and hope that some member of the Jury would pick it up and say, 'Well, it may be right.' That's just shot-gun tactics. Any 'BB' that hits, they're satisfied. Also, I wonder what explanation—I didn't hear it—they have. Was Mr. Cramer injured—and he signed that re-

lease. It says, 'To my neck, back and all other parts of my body,' and sometimes fingers and toes and everything else. He put his name on it and he wasn't even in the car. It doesn't mean that, and I suspect that some members of the Jury have signed them yourselves so you know that I'm talking about something you're way ahead of me on."

This bill was approved by the Court with these qualifications:

" * * * no objection to the statements quoted above was made; the Court was not requested to instruct the jury not to consider such statements; no complaint of any nature about such statements was made until the filing of defendant's motion for a new trial; and all of the above quoted statements were made by plaintiff's counsel in his closing argument."

Appellant's points are that the effect of these arguments was to intimate to the jury that she was insured.

While Mrs. Cramer was undergoing cross examination, the following transpired:

"Q. Isn't it true that your back was injured in an automobile accident around the 5th of April, 1956?

"A. No, sir, it wasn't.

MR. GAY: Will you mark this, please, as Defendant's Exhibit 1? (Said instrument was marked for identification as Defendant's Exhibit No. 1.)

"Q. Do you recognize the signatures?

"A. Yes, sir, I do.

"Q. Whose signatures are those?

"A. They are mine and my husband's.

"Q. Were you in an automobile which was involved in a collision with either Mr. William L. Best, Mrs. William L. Best or Barbara Best?

"A. Barbara Best.

"Q. All right.

* * * * * *

"Q. (By Mr. Gay) Mrs. Cramer, I want to read from this, and you watch to see that I am reading it correctly, will you?

"A. Yes, sir.

"Q. 'KNOW ALL MEN BY THESE—' Was Mr. Cramer in the car at the time?

"A. No, sir, my daughter and I were the only two people in the car.

"Q. All right. 'KNOW ALL MEN BY THESE PRESENTS, That I Bill A. Cramer and Patty J. Cramer, for and in consideration of $328.95 to me in hand paid by Mr. and Mrs. William L. Best and Barbara Best,' and so forth, '—release all causes of action from an accident to a 1951 Plymouth and ourselves.' Were you in a 1951 Plymouth?

"A. I was, yes. That's what we were driving in.

"Q. '—which occurred on or about the 5th day of April, 1956, by reason of personal injuries to my neck, back, head and all other parts of my body, the extent being unknown and undetermined, and property damage more especially to a 1951 Plymouth, the extent being unknown and undetermined, arising out of an accident in Austin, Texas.' Did I read that correctly?

"A. You read that correctly.

"Q. And you signed that?

"A. I did.

"Q. I believe that's all."

Mrs. Cramer denied, and this denial is undisputed, that she was injured in such collision or that she had made a claim for

personal injuries as a result of such collision.

Appellee, thereafter, called Mr. William G. Washington as a witness and developed that he was an attorney and also in the insurance business. Mr. Washington was interrogated about the practice of insurance companies in procuring releases in settling claims, and the form of such releases. In part, Mr. Washington testified, on cross examination as follows:

"Q. Mr. Washington, what does this typed matter in here indicate to you as to whether or not a claim for personal injuries was being made?

"A. Now, Mr. Gay, like I told Mr. Byrd, I am not familiar with this particular release; however, there is typed here, 'Personal injuries to my neck, back, head and all other parts of my body, the extent being unknown and undetermined.' Now that is not usual in a release, to spell it out like that, for property damage.

"Q. Well, does that or not indicate to you that a claim was being made, that there was or may have been an injury to the neck or back or other parts of the body?

"A. Well, there would not have been a reason in the world for them to make the addition. In other words, somebody went out of their way to add with the typewriter, 'Personal injury to my neck, back, head and all other parts of my body.'"

The record further shows that on direct examination Mr. Washington testified as follows:

"Q. Well, I will restate it. Is it not true that when you take a release, and is it not true that it is the custom in this area and all other areas, when an insurance company takes a release or any Defendant takes a release for property damages and where a child has had $20.00 medical expenses, X-Rays, and where the mother was driving the car, that they require and get the signature of the mother and father and the release states, 'This release releases all property damages and all personal injuries that may have occurred or that we know about or we may not know about;' it includes everything as a catch-all; is that not true?

"A. Mr. Byrd, everything is coming at me pretty fast here. Now, this doesn't appear to be a usual release.

"Q. Is it not true, Mr. Washington, what I ask you?

"A. Well, now, this—

"Q. You can answer it.

"A. Well, no, in this particular release there is something that is entirely different from the usual claim for—

"Q. Let me ask you the question. Did you understand the question I asked?

\* \* \* \* \* \*

(By Mr. Byrd) Well, you can explain, but is it not true what I said?

"A. This is not a—

"Q. That's not the answer. You can explain and your Counsel can ask you any question you want to.

"A. Please, sir, he is not my Counsel.

"Q. Well, the lawyer on the other side. Is it not true what I said?

"A. You are going to have to repeat the question. I am sorry."

▇▇▇ As to the argument first made, it must be remembered that appellant was a girl not quite 15 years old. The natural question which would arise in a layman juror's mind would be the liability of the parents for a judgment against the girl. It is not a uniformly settled question among the states. In some states the parents, aside from agency, are responsible for damages

resulting from negligent acts of their minor children in driving automobiles for family purposes. Texas is not among these states. See Trice v. Bridgewater, 125 Tex. 75, 81 S.W.2d 63, 100 A.L.R. 1014.

The principal purpose of the argument first made, in our opinion, was to guard against the normal disinclination of a rational mind to punish one (the parents) who is without fault.

Under the circumstances here, we do not regard such argument, reasonably considered, as intimating or implying that appellant was protected by insurance. A similar argument was held not calculated to lead a jury to believe that an insurance company would have to pay any judgment rendered in Airline Motor Coaches v. Green, 217 S.W.2d 70, Beaumont Civil Appeals, writ ref., N.R.E. There, as here, the jury was instructed not to concern itself with the result of its answers to special issues. We quote from the opinion in that case:

"By its 5th Point appellant complains of a portion of the argument of appellee's counsel in his closing argument to the jury that 'You are not concerned if the defendant ever pays one penny of it,' contending that said argument insinuates and is calculated to lead the jury to believe that someone other than the defendant, towit, an insurance company would have to pay any judgment which they rendered. The argument as made by appellee's attorney from which the excerpt in Joint 5 was taken and the objection thereto are as follows:

" 'Now, gentlemen, regarding the issue on damages. We sue here for twenty-five thousand dollars, and I think you can sit down with a pencil and paper and with no trouble figure the damages sustained by her exceeding twenty-five thousand dollars, laying aside doctors' bills, which we didn't attempt to prove. There is enough testimony in the record to support twenty-five thousand dollars. That's a lot of money, but you are not concerned with

that nor with who is going to pay it. * * *'

" * * * We do not agree with appellant that this argument was calculated to lead the jury to believe that someone other than appellant, to-wit, an insurance company would have to pay any judgment rendered. As we construe the argument made, it was only an admonition to the jury to disregard the effect of their findings and to be guided solely by the evidence in arriving at the amount of damages appellee had suffered."

Appellant relies, primarily, upon Ulmer v. Mackey, 242 S.W.2d 679, Fort Worth Civil Appeals, writ ref., N.R.E. and Griffith v. Casteel, 313 S.W.2d 149, Houston Civil Appeals, writ ref., N.R.E.

In Ulmer the Court reversed a judgment against a defendant who was stationed in Korea with a United States Combat Air Force and was unable to be present at the trial, holding the Trial Court erred in overruling his motion to stay the trial. In the course of its opinion, the Court stated:

"While the facts set out in appellant's points five and six may not appear in another trial, yet it is well to observe that it is error for an opposite party to ask questions or to make arguments to the jury or statements to the court before the jury where the jury could infer that the defendant in such a case carried liability insurance. We think the following argument which appellee's attorney made to the jury is improper:

" 'This court is here to protect any rights of Sergeant Ulmer has in this matter. The court is here for that. The court doesn't ask you who is going to pay this verdict or whether it will ever be paid.' "

We do not consider this language to be authoritative to the extent that we should follow it in preference to the required and precedential holding in Motor Coaches v. Green, supra.

In Griffith v. Casteel, supra, the Court held the statement of appellee's counsel in the presence of the jury that "The defendant is not being asked to pay any money," placed before the jury the extraneous information that appellant was protected by insurance, and was reversible error under Rule 434, Texas Rules of Civil Procedure.

There was no statement to the jury here of import similar to the one in Griffith v. Casteel. The jury was not told that appellee was not being called on to pay the judgment. The jury was merely cautioned not to speculate on it. We believe the admonition to the jury here was in all material respects identical with the remarks held not to be improper in Airline Motor Coaches. If we held to the contrary, we would be in conflict with the decision in that case. This we wish to avoid.

■ Appellant's second point is that the Court erred "in permitting appellee's attorney in his closing argument to intimate that appellant was insured by telling the jury that her attorney by 'a simple telephone call to the central headquarters' could secure every release signed by anyone—that 'one call and give the name and they've got every release for property damage.'"

Appellant injected the prior collision in which Mrs. Cramer was involved into the case, and she also introduced in evidence the insurance company release which Mrs. Cramer executed as an incident thereto, and appellant cross examined Mrs. Cramer regarding it.

We find it proper and only natural that appellee sought, as best she could, to offset the inferences which could be drawn from the fact of the prior accident and the execution and form of the release. One method of doing this was to attempt to prove by Mr. Washington, as one experienced in insurance matters, that the taking of the release was routine, and that it did not signify physical injury on the part of claimant.

We regard the reference to counsel for appellee as being counsel for Mr. Washington to have been a mere slip of the tongue which was immediately corrected and which could not possibly have been injurious to appellant.

We find nothing in the bill of exception to substantiate appellee's contention that counsel for appellant in his argument to the jury stated that "her" (appellant's) attorney could by "a simple call to the central headquarters" secure releases. As we read the bill of exception, the reference made by appellee's attorney was to insurance claim adjusters of the type who procured the release from Mrs. Cramer.

We overrule points one and two.

■ Appellant's third and fourth points, jointly briefed, are that the Court erred in holding that there was any evidence to support the jury finding that $25,000.00, if paid now, would reasonably and fairly compensate Mrs. Cramer for the reasonable cost of domestic help which she would in all reasonable probability necessarily incur in the future as a direct and proximate result of her injuries, and in not holding that such finding was against the great weight and preponderance of the evidence.

After having carefully read and considered the entire statement of facts, we overrule these points.

No primary evidence was offered by appellant as to the extent of the injuries suffered by Mrs. Cramer as a result of her negligence. No primary evidence was offered by appellant to contradict or counteract any element of damage claimed or proved by Mrs. Cramer.

The case for Mrs. Cramer was established by both lay and professional witnesses.

Mrs. Cramer at the time of trial (2–15–61) was forty years of age. She and her husband had one child, a girl age 16 years. At the time of her injuries, Mrs. Cramer did all of her housework, some of the yard

work, and was a substitute teacher in the Austin elementary schools.

Mrs. Cramer was treated by her family physician, Dr. Pruett Watkins, from the day of her injury until he referred her to Dr. Albert LaLonde, a neurological surgeon, on March 24, 1960. Dr. LaLonde diagnosed her condition as a chronic lumbar disc protrusion. He testified that she would never have a normal back.

Mrs. Cramer testified:

"Q. Do you sleep well at nights, Mrs. Cramer?

"A. I sleep all right except when I have severe muscle spasms, and then I don't.

"Q. When do you have severe muscle spasms?

"A. I have them after I do heavy housework and lifting and excessive bending and stooping.

"Q. Well, define for the Jury what you mean by heavy housework, lifting, bending and stooping.

"A. Mopping the floors and waxing, cleaning my woodwork, emptying the trash cans, running the vacuum, moving the furniture.

\*    \*    \*    \*    \*    \*

"Q. Well, tell the Jury, if you can, what you have experienced in the way of trying to work out a routine that you can do so that you will know what you can and can't do.

"A. In trying to take over the household duties of my home, when I do the heavy work, such as these things I have mentioned, vacuuming and moving furniture and dusting and cleaning and heavy jobs of that type, I follow up with a severe muscle spasm, and as a result, have to go to bed for some two or three days, depending upon the severity of the spasm."

On cross examination Mrs. Cramer testified:

"Q. Of course, you did gradually take on more and more of your household responsibilities, did you not?

"A. Yes, sir, I tried, all of the time I tried to do that.

"Q. And by the first of February, were you doing about as much of your household work as you had done in the past?

"A. I was trying, but the pattern that it followed was that I would try to do the things that I felt were my responsibility, and muscle spasms, and then I would have to be in bed, and then as I was able to try again, I did. I always felt like it was my place to do that work if I could.

\*    \*    \*    \*    \*    \*

"Q. And I believe you have stated that you had tried to do some of all of the work that you had been doing in the past; is that correct?

"A. I had tried. I know that I had tried to do all that I could.

"Q. Was there any part of the work that you had determined by the first of February that you could not do?

"A. I had determined—yes, indeed.

"Q. What?

"A. I had determined from these muscle spasms that I had, that I was not ready to do extensive, to do heavy work.

"Q. All right. Now, will you define the heavy work that you were not ready to do on the first of February?

"A. Mopping, lifting trash cans, carrying grocery bags in, running the vacuum, making beds, stooping and bending and lifting.

"Q. Then, during the month of February, were you able to do any of

those things so that by the first of March your activities had increased?

"A. I could not say. It was a matter of trying and muscle spasms, and trying, and muscle spasms, and I cannot really get involved in dates on that. I just know it followed that pattern consistently.

\* \* \* \* \* \*

"Q. All right. Had you had any pain between the time you were injured and March 16th?

"A. I had had muscle spasms and was in bed with them, and out of bed with them. That was just a thing that had happened, that was a pattern that it followed all the way, and I had been under the doctor's care all of that time.

\* \* \* \* \* \*

"Q. Do you ever do any of the washing now?

"A. If I am placed on restricted activity by the doctor, I don't do it. If he has taken me off of restricted activity, then I do anything and everything that I want to do.

"Q. I see. Now, what doctor are you talking about?

"A. Dr. LaLonde.

"Q. And how often do you see Dr. LaLonde?

"A. I see him or call him whenever I have a muscle spasm.

"Q. And then, too, at a particular time you are on restricted activity or are not on restricted activity?

"A. Yes, sir.

"Q. All right. Right now, Mrs. Cramer, are you on restricted activity or not?

"A. I am, as of last Wednesday. Before that, I was not on restricted

activity for some five, four or five weeks, due to Dr. LaLonde's request.

"Q. In other words, it depends on what Dr. LaLonde tells you—

"A. Yes, sir."

On redirect examination Mrs. Carmer testified:

"Q. Mrs. Cramer, on each of these occasions that you have told us about, when you said you got to feeling much better, and as you got to feeling better, you expanded your activities and started doing more and more, and on many occasions, as you did that, you went back down in bed with a muscle spasm; I want to ask you if it is correct that on each of those occasions from December 5th clear on up until the present time that just before you went back in bed with a muscle spasm, that you felt that you were doing much better?

"A. Yes, sir, I did.

"Q. And had you been going out much more and moving around more in your activities?

"A. I had been.

"Q. And did you feel you were greatly improved?

"A. I did think that I had, was improved.

"Q. And was that the reason that you expanded your activities in your housework?

"A. Yes, it was.

"Q. Was that true on each occasion that you had these back spasms that put you in bed?

"A. Yes, sir, it was.

"Q. Including the time that you picked up the wash along with your other housework?

"A. Yes, sir, and including all of the others.

"Q. I believe that's all, Mrs. Cramer. Thank you."

When being questioned about a back brace, Mrs. Cramer testified on cross examination:

"Q. Ordinarily, Mrs. Cramer, how often do you wear it? Do you usually wear it when you go to school, for example?

"A. Only occasionally.

"Q. Do you wear it as often as once a week?

"A. Well, that all depends. Sometimes I go without having muscle spasms for a time, so, therefore, I don't wear it.

"Q. What brings on the muscle spasms?

"A. The stooping, sitting, cleaning, mopping, moving heavy furniture, running the vacuum.

"Q. All right.

"A. Long periods of sitting.

"Q. When you do the heavy work you have told us about, such as mopping, moving the furniture, that sort of thing, then, you may—that may bring on a muscle spasm, is that correct?

"A. It has.

"Q. It has?

"A. In the past. The pattern has followed that way.

"Q. It doesn't invariably do that, usually, does it?

"A. That is the pattern it has taken.

"Q. Yes. What I asked you was, does it invariably do that?

"A. Well, do you mean does it always?

"Q. Does it always?

"A. It does.

"Q. It always does it. And so, then, when it comes on, you put on your brace?

"A. When it comes on, I start on this pain drug and go to bed for a day or two or three, depending upon the severity of it, and when it relaxes, then, I again get up and start over."

Dr. Watkins testified:

"Q. Now, Doctor, basing your opinion on reasonable medical probability, from March—I mean, from—and from the period December 5, '59, the date of this accident, up to March 18th, or whenever it was you referred her to Dr. LaLonde, 1960, would Mrs. Cramer's condition permit her to carry on her usual activities of a full time housewife and as a substitute teacher in the Public Schools, both jobs?

"A. Not full time, certainly.

"Q. All right.

"A. There were intervals when she could not possibly have done it. There might have been days when she felt that she could, but full time employment, no.

"Q. Well, I mean full time housewife employment, the work that a housewife normally does, and in addition to that, substitute teaching?

"A. No.

"Q. Basing your opinion upon reasonable medical probability and for that same period, from the date of her injury up until you transferred her to Dr. LaLonde, would her, Mrs. Cramer's condition, permit her to perform the bending, stooping, lifting activities that a housewife normally does every day?

"A. She could not do them every day. There might have been periods

when she could have done those, but not every day.

"Q. Now, one of those periods was when she came back in your office with muscle spasms, was it not, from the washing clothes and doing her housework?

"A. Yes, yes, that's—

"Q. What was the result during the period that you treated her when she did attempt to go back to her normal household duties, such as this washing that you have told us about?

"A. This was a variable thing. Some of these duties she could perform at times, and others, seemingly, she could not.

"Q. Is that consistent with your experience with injuries of this type, back injuries, low back injuries?

"A. Yes, I think it is generally consistent with that. Sometimes they can perform these usual menial household chores and sometimes they cannot.

"Q. I had reference to the muscle spasm being caused by bending and stooping and lifting; is that consistent with a low back injury of the type she had when you were treating her?

"A. It often follows, yes."

Dr. LaLonde testified:

"A. On the 11th of November she came in because she was still having episodes of muscle spasm in the back, stated that it was painful to turn over in bed. The examination at that time revealed restriction of back motion. She was advised that she would probably continue to experience, continue to have these episodes of spasm of the low back with restriction of motion from time to time, and that she should wear a corset when it afforded, seemed to afford some relief.

"Q. Have you seen her since then?

"A. * * * On the 8th of—yes, 17th of January, we suggested that she try to increase her activity.

"Q. Did she do that?

"A. And for this—one reason was, as a sort—of a test to see whether or not the symptoms would be aggravated and how severe they would become, since I felt that what she had had up to this time was a relatively chronic lumbar disc protrusion. She was unhappy about the fact that she was partially incapacitated with it, and we do not recommend operating on a person with low grade symptoms or for chronic disc protrusion, when the disability is not extreme. We prefer to operate if they are in an acute attack and are completely disabled. So, she did increase her activity at my suggestion. On the 7th of February, she began to have severe back pain in the lumbar area with dull throbbing pain over the lateral aspects, that means the outside of the left thigh. The pain was aggravated by lifting, stooping, sitting and relieved by lying down, which is about the only thing that gives her relief.

* * * * * *

"Q. In you opinion, Doctor, will Mrs. Cramer's present condition, as she was on February 8th, as you saw her, permit her to do the bending and stooping and lifting activities that a housewife normally does every day?

"A. Not without the production of attacks of pain.

"Q. She could do it, if she wanted to just go ahead and do it, but the results is what would be bad; is that correct.

"A. Yes.

"Q. At the present time, do you feel it is necessary that she employ part-time domestic help to assist her in performing those duties?

"A. Yes.

"Q. And Mrs. Cramer has testified that she had a maid five hours a day for four days, in the last few months. Now, if you assume a successful operation, that she falls in the 85 percent, and, of course, basing your opinion on reasonable medical probability, will it be necessary for her to employ part-time domestic help in the future to perform the bending, stooping and lifting exercises that a housewife does?

"A. Well, I think that would be advisable, because when an individual has to perform these activities, they are more susceptible to further trouble.

"Q. Would that be advisable for the rest of her life?

"A. Yes.

"Q. At any time—well, during the time that she has been under your care, Dr. LaLonde, has Mrs. Cramer been able, or at least has her condition been such that she could hold down a complete job, that is, the housewife's total job, without any assistance at all, and in addition to that teach as a substitute teacher in the Austin Public Schools?

"A. Would you repeat that, please?

"Q. Since she has been under your care, has she been able to hold down both of those jobs, full-time domestic help, without any assistance from lifting and bending, and at the same time care of—

"A. No, she hasn't been able to do it, because she has had episodes of pain where she had been incapacitated.

"Q. I see, sir. Is it normal for a disc protrusion to be extremely painful?

"A. Yes

"Q. Is it normal for a disc protrusion to cause back muscle spasm such as you have demonstrated that Mrs. Cramer had?

"A. That is the usual result.

"Q. Is it normal and usual for disc protrusions, as you have demonstrated, to be disabling?

"A. Yes."

Mrs. Cramer testified:

"Q. I see. Now, Mrs. Cramer, have you been physically able to do all of your housework and to hold down your teaching job, too, since you were injured, both jobs?

"A. No, sir, I haven't.

\*　\*　\*　\*　\*　\*

"Q. Has it been necessary for you to have part-time domestic help at all times since you returned to your teaching job?

"A. Yes.

"Q. And why is it that you have to have that since you have returned to your teaching job?

"A. Because I cannot do lifting and the keeping of my home and teach school, too."

Mrs. Cramer also testified that she had not employed domestic help between the time she was injured and the time she returned to substitute teaching. During this period the heavy domestic work was done by her daughter and husband.

We do not recite it, but there was strong testimony from neighbors of Mrs. Cramer comparing her very active life before her injuries and her restricted activities afterwards.

It is appellant's view of the evidence that "domestic help was neither required nor contemplated except while she was teaching school;" that there was not only "some connection" between her need for domestic help and her teaching activities but that such help would be employed only when

she was teaching "and that there was no evidence as to how long she would teach."

■ There are isolated statements in the testimony which tend to support this contention. We do not rest our decision, however, upon isolated statements, but upon the record as a whole in determining whether a verdict is against the overwhelming preponderance of the evidence.

It is our opinion that the evidence here clearly preponderates in favor of a finding that Mrs. Cramer will be unable to perform all the usual household duties of a wife for the remainder of her life, and this regardless of whether or not she continues to teach.

It is true that while Mrs. Cramer was incapacitated and not teaching, no domestic help was employed, and that only when she returned to teaching that such help was obtained. It is not correct that during such period, Mrs. Cramer did all the house work or that she did not suffer from what she did.

A reasonable deduction from this situation would seem to be that domestic help was obtained when family finances permitted it. We also observe that domestic work has value whether paid for in money, affection, or whether not paid for at all.

Mrs. Cramer has a life expectancy of 35.64 years. The weekly cost of domestic help required by Mrs. Cramer was shown to be $21.60. The present value of $21.60 payable at the end of each week for 35.64 years, interest compounded semiannually at the rate of interest shown is, as is actuarily certified:

| "Interest Rate | Present Value |
| --- | --- |
| 1% | $ 33,685.02 |
| 2% | 28,665.46 |
| 3% | 24,660.86 |
| 4% | 21,438.16" |

■ The jury has great latitude in finding the present value of future damages.

Texas Consolidated Transportation Co. v. Eubanks, 340 S.W.2d 830, Waco Civil Appeals, writ ref., N.R.E.

■ Point 5 is that the Court erred in its definition of "negligence" and "ordinary care" in the charge in that it required appellant's conduct to be measured by the standard applicable to adults and not by the standard of conduct applicable to persons of her own age, intelligence, experience and capacity. Adequate objections to the Court's charge were made by appellant, and in addition she requested the submission of this issue:

"By the term 'negligence' as used in this charge, as applied to the minor defendant, is meant the doing of that which an ordinarily prudent person of the age, intelligence, experience and capacity of the minor would not do, or the failure to do that which an ordinarily prudent person of the age, intelligence, experience and capacity of the minor would do under the same or similar circumstances."

Appellant cites several cases to sustain this point, including: Cook v. Houston Direct Navigation Co., 76 Tex. 353, 13 S.W. 475; Gulf, Colorado & Santa Fe Ry. Co. v. McWhirter, 77 Tex. 356, 14 S.W. 26; Missouri K. & T. Ry. Co. of Texas v. Rodgers, 89 Tex. 675, 36 S.W. 243; Texas & P. Ry. Co. v. Phillips, 91 Tex. 278, 42 S.W. 852 and Dallas Ry. & Terminal Co. v. Rogers, 147 Tex. 617, 218 S.W.2d 456.

In Cook the child whose negligence was involved was 13 years and 9 months old. The Court held it was an issue of fact as to whether she possessed adult discretion.

In McWhirter where several children ages 5–15 were involved the Court sustained this charge:

"If, from the evidence, you believe plaintiff was injured, but further believe that the same was caused by other parties than defendant's agents and employes revolving said table, and if

you believe such other parties were of such age and intelligence as to know the danger of revolving such table, and of such age and intelligence as to be responsible for their own negligent acts, then, if you so believe, you should find for defendant. But, if you should believe from the evidence that such other parties were not of such age, discretion, and intelligence as to realize the danger of their acts, and negligence in the transaction, then the defendant would be responsible * *. Whether or not the person who the proof may show revolved the table was of sufficient age and intelligence and discretion to realize the danger of revolving the table * * * you must determine from the evidence in the case."

In Rodgers the child whose conduct was in question was between 13 and 14 years of age. The Court in reversing the case because of an improper charge stated "Whether or not the plaintiff was of immature years, and so wanting in intelligence that he could not appreciate the danger of getting upon the car, is a question of fact to be found by the jury under the evidence that may be adduced on another trial."

In Phillips the child was 14 years of age. The Court, in reversing the case, referred the Trial Court to the Rodgers case, discussed above.

In Dallas Railway the Court held, as a matter of law, that there was no presumption that an 11 year old child possessed adult discretion.

If appellant had been 11 years old at the time of the collision, we would follow the decision in Dallas Railway. Since she was then 14½ years of age we believe, under the cases cited by appellant that she is subject to the rule prescribed for a 16-year old person in Seinsheimer v. Burkhart, 132 Tex. 336, 122 S.W.2d 1063, as follows:

"The charge to the jury contained the usual definitions of negligence and proximate cause. To these definitions plaintiffs in error objected and excepted upon the ground that they placed upon this 16 year old boy the duty of exercising such care as an adult would have exercised under the same or similar circumstances, and the duty of anticipating, in the exercise of such care as an adult would have exercised, that the injuries might result. It is claimed that the standard for determining this boy's negligence should have been that of an ordinarily prudent boy of 16 years of age and not that of an adult of ordinary prudence. If Flood was wanting in discretion or laboring under the handicap of some mental defect the burden was upon him to establish that fact. The presumption is that he was normal. We are referred to no testimony tending to overcome this presumption or raising an issue of fact as to his mental deficiency and the court did not therefore err in overruling this exception to the charge."

There is neither pleading nor evidence that appellant is abnormal in any respect. In fact, the evidence is very much to the contrary. Point 5 is overruled.

Appellant's last point is that the Court erred in framing the damage issues in the name of Mrs. Cramer rather than in the name of her husband who was the only party plaintiff.

It would have been mystifying and confusing to the jury if the issues had used the name of Mr. Cramer only.

We believe the issues were properly framed. If not, the error is harmless under Rule 434, T.R.C.P.

There being no reversible error, we affirm the judgment of the Trial Court.

Affirmed.