**Herbert A. MEYERS, Appellant,**

**v.**

**Sid E. SEARCY, Appellee.**

**No. 15049.**

Court of Civil Appeals of Texas, San Antonio.

Dec. 6, 1972.

Michael M. Fulton, Beckmann, Standard, Keene, Krenek & Fulton, San Antonio, for appellant.

Phillip D. Hardberger, San Antonio, Malcolm McGregor, Philip T. Cole, El Paso, for appellee.

CADENA, Justice.

Defendant, Herbert A. Meyers, appeals from a judgment, based on a jury verdict, awarding plaintiff, Sid E. Searcy, $20,000 as damages for personal injuries resulting from a vehicular collision.

■ We consider first defendant's contention that the verdict is excessive and that the trial court erred in not granting a remittitur.

Plaintiff is, and was, prior to the accident, a truck driver whose regular run was from El Paso, Texas, to Tucson, Arizona, and back. He made about three weekly round trips, earning about $100 a trip, so that his average weekly earnings, according to his testimony during the trial, amounted to $300. In his deposition he had stated that he earned an average of $335 per week. At the time of the trial he was earning, because of a raise, about $358 per week.

The accident occurred on June 10, 1969, in Lordsburg, Arizona. As a result of the impact between the two vehicles, and the subsequent collision of plaintiff's truck with a utility pole, plaintiff's head struck the top of the truck cab, and his left shoulder was thrown against the left door of the cab, bending the frame. Plaintiff did not lose consciousness and was able to walk after the accident, although he had no feeling in his left arm. He was taken to a Lordsburg hospital where his left arm and shoulder were X-rayed. The X rays showed no broken bones, and plaintiff returned to El Paso, apparently the same day. He was not admitted to the hospital in Lordsburg.

Plaintiff described his physical condition after the wreck and at the time of trial as follows: At times his arm becomes numb. He experiences burning sensations in his arm and neck. Between his shoulder blades he suffers pain which feels as though he had "just been struck with a knife." He cannot tilt his head back with-

out feeling pain. Although he returned to his employment as truck driver a few weeks after the accident, the fact that the truck "rides rough" causes the pain in his neck to increase, and this pain "just keeps going further down." He can no longer accept trips which require that he assist in unloading the truck. He suffers from periodic headaches. He is unable to do yard work, and can no longer wrestle with his son, an activity in which he engaged frequently prior to his injury.

Although plaintiff testified that he had consulted three doctors and had also been treated at an army hospital in El Paso, only one medical witness testified. Dr. Palafox, an orthopedist, first saw plaintiff on October 10, 1969, four months after the accident. At that time Dr. Palafox diagnosed plaintiff's condition as "post-traumatic cervical disc syndrome," and prescribed, in addition to pain killers, muscle relaxants and physical therapy, a neck brace which plaintiff wore for a while. According to Dr. Palafox's records, he did not see plaintiff again until April 6, 1971, about two weeks before the trial, although plaintiff testified that he had been to the doctor's office about five or six times, apparently for physical therapy. When the doctor last examined plaintiff shortly before the trial, a Spurling test revealed the existence of damage to the neck structure. X rays revealed no damage to the bone structure nor narrowing of the space between the intervertebral discs. An electromyelogram yielded negative results.

Dr. Palafox testified that plaintiff was suffering from damage to an intervertebral disc, consisting of tears in the anulus fibrosis. This injury is very painful and results in pain between the shoulder blades, headaches and dizziness. The injury resulted from the collision and plaintiff's condition, which is permanent, produces a physical impairment of 25%. Persons who suffer from this condition must learn to live with it, since there is little that doctors can do.

Dr. Palafox, who has had considerable experience making pre-employment physical examinations, stated that he would not "pass" plaintiff for employment as a truck driver, since such employment requires that plaintiff assume the worst possible bodily posture for a person with this particular type of disc injury. Persons suffering from such a condition should seek employment that does ot require sitting or being "bounced around" as is a truck driver.

The doctor testified that his conclusions concerning plaintiff's injury were not based on "objective" findings. However, according to his testimony, 95% of "all people with disc injuries do not have any objective findings."

Defendant produced no medical testimony.

At the trial, plaintiff testified that, as a result of his injury, he had lost about $2,000 in earnings before he was able to return to work. He had previously stated, in deposition, that he had lost $1,005 in wages during this period. He explained this discrepancy by saying that, at the time his deposition was taken, he understood the question as referring to the time he had lost between the date of the accident and the date on which he first attempted to return to work. He added that he attempted to return to work about three weeks after the accident, and started on a trip from El Paso to Tucson. However, when he had proceeded about 25 miles, he felt "so bad" that he could not continue the trip, and his employer had to send another driver to relieve him and continue the trip. After some time, the length of which is not revealed, he made a second effort, also abortive, to return to work. These two unsuccessful efforts to return to work, with the resulting loss of additional time, increased the amount of lost earnings, prior to the time that he made a third and successful effort to return to work, to $2,000.

At the time of the accident, plaintiff's average weekly earnings amounted to $300, if we accept his testimony at the trial, or $335, if we accept his statement in his deposition. After the accident, because of a blanket increase given to all truck drivers

by the employer, his average weekly wage rose to $358.

Plaintiff's income tax returns for 1967–1970, introduced into evidence by defendant, show that he earned $12,682 in 1967, $15,458 in 1968, $14,600 in 1969 (the year of his injury), and $14,800 in 1970, the year after his injury. Since plaintiff admitted that in 1970 he lost $900 in earnings for causes unrelated to his injury, we consider the figure of $15,700 as representing his 1970 earnings.

Under this testimony, it cannot be said that the trial court erred in refusing to grant defendant's motion for remittitur.[1]

Next, defendant complains that the trial court erred in overruling his objection to a question asked of a witness for plaintiff relating to plaintiff's future earnings, on the ground that the question erroneously assumed that plaintiff had suffered a complete loss of future earning capacity.

A professor of economics, after giving testimony relating to plaintiff's life expectancy and "work life" expectancy, was asked the following question: "Assume he had $1,000 a month of earning capacity. I will ask you to assume further that we are going to cut off his earning capacity entirely. Can you tell the Jury . . . how you would go about evaluating a cash figure that would replace that earning capacity of an expectant work life?" After defendant's objection, based on the fact that there was no evidence showing that plaintiff's earning capacity had been "cut off"

entirely, had been overruled, the witness said that plaintiff could expect to earn $264,000 during his lifetime, and that, taking into account inflation and technological advances resulting in an increase in productivity, plaintiff could expect to earn $551,940 in the future. He added that the present cash value of this sum, "if paid now," would be $402,787.

■■■ An examination of the whole record compels the conclusion that the error, if any, in overruling defendant's objection, was harmless. The entire testimony of the witness makes it clear that he was assuming that there would be no impairment of earning capacity. The witness stated that he did not know whether plaintiff would continue in his present employment and that he was not attempting to evaluate "any percentage disability with regard to" plaintiff. In answer to a subsequent question, inquiring what a man of plaintiff's age, earning plaintiff's salary, could be expected to earn during "his expected work life," the witness answered that, taking into account the factors which he had mentioned, such a man could expect to earn $551,940. This question did not ask the witness to assume that the earning capacity of the person had been completely "cut off." If the witness had indulged the unwarranted assumption that the earning capacity of such a man had been completely "cut off," his answer would have had to be that a man who had no earning capacity could not reasonably be expected to earn anything during the remainder of his life. Since the unwarranted assumption obvious-

1.  Plaintiff's earning in 1968, before he was injured, exceeded his 1967 earnings by almost $2,800. In 1969, the year he was injured, his earnings decreased by $850. If we accept his deposition testimony that he lost $1,005 in 1969 because of the injury, he would have earned $15,605 in that year, a slight increase over the previous year. If we accept his trial testimony that he lost $2,000 in 1969, then his 1969 earnings would have an increase of more than $1,000 over the previous year. If we assume that the injury resulted in a loss of $1,005 in earnings in 1969, then his 1970 earnings show an

increase of $95 over the previous year. If he lost $2,000 in 1969 due to his injury, his 1970 earnings show a decrease of $900 over what he would have earned in the previous year but for the injury. This is despite the fact that he received a wage increase of $23 weekly, if we accept his deposition statement that at the time of the injury he was earning $335 per week, or $58 weekly, if we accept his testimony at the trial. In addition, of course, the uncontradicted testimony shows that plaintiff, for the rest of his life, will suffer pain which is exacerbated by his continued effort to earn a livelihood.

ly did not affect the answer of the witness, the inclusion of the assumption in the preliminary portion of the question cannot be said to have had a prejudicial effect. We are justified in assuming that jurors are capable of seeing that which is obvious.

Finally, defendant contends that the trial court erred in overruling his "motion for mistrial and motion for new trial on the basis that the questions, statements and remarks by the attorney for" plaintiff "on voir dire examination clearly injected insurance into the case and advised the jury that the defendant . . . was protected by liability insurance . . . ."

The voir dire examination of the jury panel was not recorded by the court reporter, and we must rely on the recitals in defendant's bill of exception. The bill is susceptible to the construction that defendant moved for a mistrial twice during the voir dire examination of the prospective jurors, and that both such motions were overruled. However, the defendant's motion for a new trial contains only one paragraph relating to any ruling of the court in connection with a motion for mistrial. Paragraph 6 of the motion for new trial asserts that the trial court erred in overruling defendant's motion for mistrial "based on the statements and questions of" plaintiff's attorney "as set out in Paragraph No. 5." Paragraph 5 of the motion for new trial refers exclusively to remarks directed by plaintiff's attorney, in the presence of the entire panel, to the prospective juror, Haecker. After this panelist indicated that he could not render a verdict in favor of plaintiff in the sum of $60,000, the amount sued for, even if the facts warranted such a verdict, because he did not want the "responsibility of deciding about that much money," plaintiff's counsel stated that, although the jury might think that they were deciding how much one person should pay another, "that might not be the case at all." Plaintiff's attorney then said that a juror should not concern himself with the question of who would pay the judgment, or whether the judgment would be paid at all.

Statements of this nature have not been considered as informing the jury that defendant is protected by insurance. Ex Parte Jones, 160 Tex. 321, 331 S.W.2d 202 (1960); Renegar v. Cramer, 354 S.W.2d 663 (Tex.Civ.App.—Austin 1962, writ ref'd n.r.e.); Airline Motor Coaches v. Green, 217 S.W.2d 70 (Tex.Civ.App.—Beaumont 1949, writ ref'd n.r.e.).

The bill of exceptions on its face does not purport to contain the full voir dire examination of the panel. In addition to the statements made by counsel for plaintiff to the prospective juror, Haecker, considered in the two immediately preceding paragraphs of this opinion, the bill refers only to the fact that, in his preliminary remarks and questions addressed to the entire panel, counsel for plaintiff inquired if any member of the panel, or any friend or relative of a member of the panel, worked, or had worked, for an insurance company, and the individual questioning of the two members of the panel, Curren and Schaker, who answered this question in the affirmative, and counsel for plaintiff's questioning of a third member of the panel, Kistner. The bill reflects that in his questioning of Curren, Schaker and Kistner, counsel for plaintiff specifically asked them if they had ever worked for automobile liability insurance companies. Curren and Schaker answered this question in the negative, and also stated that the fact that they worked, or had worked, for insurance companies would not prejudice them against defendant. Kistner, in answer to specific questions, stated that the insurance company for which he worked handled automobile liability insurance; that he, as a claims examiner for the agency, had personally handled automobile liability insurance claims; that he was acquainted with the members of the law firm representing defendant in this case; that such firm had represented the insurance company for which Kistner worked for several years in defending against claims; and that a lawyer associated with such firm was the son of a former owner of the insurance agency for which Kistner worked.

The bill shows that defendant did not object to any of these questions and did not ask the court to instruct the members of the panel to disregard such questions and the answers thereto. As already pointed out, defendant's motion for new trial based on the overruling of his motion for mistrial, did not, even indirectly, relate to the questioning of Curren, Schaker and Kistner, nor to the general question, addressed to the entire panel, inquiring about employment by an insurance company.

We, therefore, have before us a case where questions relating to insurance generally and to liability insurance in particular, were asked of the prospective jurors while defendant, the victim of such alleged misconduct, stood silently by without objecting to the questions, or answers, and without asking the trial judge to instruct the jury to disregard the question of insurance and not allow the questions or answers to affect their verdict. Insofar as the motion for new trial is concerned, it contains several paragraphs asserting that the *attorney for the plaintiff* "committed reversible error" by injecting insurance into the case during the voir dire examination of the prospective jurors Curren, Schaker and Kistner, and by his general question inquiring of the entire panel whether any member of the panel, or any friend or relative, worked or had worked for an insurance company.

Clearly, the defendant's motion for new trial does not complain of any ruling by the trial court. At best, the complaints in the motion for new trial can be construed as asserting that the misconduct of counsel for plaintiff, in injecting insurance into the case, constitutes such grievous error that admonitory instructions or other curative measures would not eliminate the probable prejudicial effect of the misconduct.

There are cases holding that the injection of insurance into a case constitutes reversible error *per se*. One of the more recent cases adopting this approach is A. J. Miller Trucking Co. v. Wood, 474 S.W.2d

763 (Tex.Civ.App.—Tyler 1972, writ ref'd n.r.e.), which contains a reference to many of the cases on the subject. This theory is based on the presumption, grounded on what is described as judicial knowledge, that a jury is apt to resolve the questions of liability and damages in favor of plaintiff if it knows that the defendant is protected by insurance. Barrington v. Duncan, 140 Tex. 510, 169 S.W.2d 462 (1943).

However, we believe that the opinion of the Supreme Court in Dennis v. Hulse, 362 S.W.2d 308 (1962), precludes the avoidance of the clear mandate of Rules 434 and 503 by application of the doctrine of presumed harm. In *Dennis*, Mr. Justice Walker said:

"Respondent argues that the mention of insurance always requires a reversal of the case, because the error is regarded as incurable. We do not agree. When the courts say that an error is incurable, they usually mean that instructions or other curative measures . . . will not eliminate the danger of prejudice. Under our practice an appellate court is not authorized to reverse merely because the record discloses some error that is reasonably calculated to cause a miscarriage of justice. *The party appealing must also show that it probably did cause the rendition of an improper judgment in the case.* Rules 434 and 503, Texas Rules of Civil Procedure." 362 S.W.2d at 309 (emphasis added).

Pursuant to the provisions of Rule 226a, Texas Rules of Civil Procedure, the Supreme Court has directed that jurors be instructed not to "consider, discuss or speculate whether or not any party is or is not protected in whole or in part by insurance of any kind." The approval of this instruction must be regarded as reflecting the Court's belief that a jury can, and will, obey it, unless we are ready to assume that the Supreme Court, in approving the instruction, was merely indulging in an exercise in futility. We, therefore, cannot agree with the statement in *Wood* to the effect that such instruction is "not ade-

quate and sufficient to remove the harm caused" by the injection of insurance. 474 S.W.2d at 766.

We conclude, on the basis of *Dennis* and Rules 434 and 503, that injection of insurance into a case is not ground for reversal unless, from a review of the entire record, the appellate court is convinced that the injection of insurance probably caused the rendition of an improper judgment. Defendant does not here challenge the sufficiency of the evidence to support the answers of the jury to the issues imposing liability, nor does he contend that such answers are contrary to the preponderance of the evidence. We have reviewed, in our consideration of defendant's contention that the trial court erred in not ordering a remittitur, the evidence relating to damages and have concluded that there is no basis for holding that the verdict is excessive. Since a review of the entire record does not support the conclusion that the error complained of "probably did cause the rendition of an improper judgment," we must, in obedience to Rules 434 and 503, affirm the judgment of the trial court.