COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| | | |
|---|---|---|
| ROSAURA ARREOLA,<br>Individually and on Behalf of the Estate of<br>JASON OROSCO MOLINAR,<br>Deceased, | § | No. 08-20-00133-CV |
| | § | |
| | § | |
| | § | Appeal from the |
| Appellant, | § | County Court at Law No. 6 |
| v. | § | of El Paso County, Texas |
| UNION PACIFIC RAILROAD,<br>HERBERT DIAZ and BERT FREDRICK<br>HARKNESS, | § | (TC# 2016DCV3664) |
| | § | |
| Appellees. | § | |

## O P I N I O N

Sixteen-year-old Jason Orosco Molinar (Molinar) tragically lost his life when a Union Pacific train struck him as he was walking on the railroad tracks in Marfa, Texas. Molinar was wearing headphones and was walking with his back to the oncoming train. Molinar's mother, Appellant Rosaura Arreola (Arreola), sued in her individual capacity, as well as on behalf of Molinar's estate. She alleged that Appellees Union Pacific, Herbert Diaz (the train's conductor), and Bert Fredrick Harkness (the train's engineer), were negligent in failing to adequately warn Molinar of the train's approach and in failing to slow or stop the train in a timely manner. Arreola also alleged that Union Pacific had failed to adequately instruct its employees on the proper

procedures to follow when confronted with a person walking on the tracks. Following trial, a jury returned a verdict finding Molinar 90% and Union Pacific 10% at fault for the accident.[1] The trial court thereafter entered a take-nothing judgment in Union Pacific's favor.

On appeal, Arreola contends that the trial court: committed errors in its evidentiary rulings; erred in denying her request for spoliation instructions; erroneously instructed the jury that Molinar should be judged by an adult standard of care; and that the trial court judge exhibited a bias that deprived her of a fair trial. Further, Arreola contends that there was insufficient evidence to support the jury's verdict. For the reasons noted below, we affirm the trial court's judgment.

## I. BACKGROUND

At the time of the accident, Molinar lived in Marfa, Texas with his aunt and other relatives. His aunt testified that on the day of the accident, Molinar was going to a Dairy Queen on the other side of town. Molinar was walking on the rails of the train track carrying an iPad and wearing headphones when a Union Pacific train approached him from behind. It is undisputed that the train was a "key train" that was carrying hazardous materials and was travelling at a lawful speed as it went through town, blowing its horn at the various crossings.

Both Harkness (the train's engineer) and Diaz (the train's conductor) testified that shortly before the accident, they were coming around a curve when Harkness first spotted something red on the tracks. Initially, Harkness told Diaz that he believed the red object was a "red flag" that Union Pacific occasionally places on the tracks to test the train's crew to see if they are alert; when spotted, the crew has a specified time to stop the train, using the train's normal braking system. Diaz used a binocular that he had with him to determine what Harkness had seen on the tracks. He

---

[1] In the jury charge, the trial court instructed the jury that any negligence on the part of either Diaz or Harkness was attributable to their employer, Union Pacific Railroad Company. The charge therefore only asked the jury to determine whether Union Pacific was negligent, and if so, what percentage of responsibility it bore for the accident in relation to Molinar's negligence.

2

immediately recognized that there was a person—later identified as Molinar—walking on the tracks wearing a red shirt. Neither Diaz nor Harkness, however, could discern that Molinar was wearing headphones at that time.

Diaz immediately alerted Harkness to begin blowing the train's horn to warn Molinar to get off the tracks. Harkness blew the horn in a long continuous manner, while Diaz continued to track Molinar's actions, anticipating that he would leave the tracks upon hearing the horn's warning. When Diaz realized that Molinar was not responding to the warning, he told Harkness to apply the emergency brakes.

The train's event recorder—a device similar to a black box on an airplane—stores data from a GPS-linked clock and provides timestamps for events such as when the horn was blown and when the brakes were applied. It showed that the emergency brakes were engaged at 12:38:48. Because it takes at least one or two seconds for the brakes to engage after the lever is pulled, Harkness would have pulled the brake lever at 12:38:46 or 12:38:47. But it was too late to stop the train at that point, and the impact occurred approximately five seconds later, at 12:38:53 or 12:38:54. The train was traveling at 49-50 miles an hour before the emergency braking, but had only slowed to 48 miles an hour at the time of impact. The train came to a complete stop at 12:39:39, some 51 seconds after the emergency brakes were engaged.

At trial, the jury was shown a video of the accident, which was recorded by the train's camera. The video showed that Molinar turned around approximately one second before impact— unfortunately too late to avoid being struck by the train. The video included an audio portion, which captured the sound of the horn blowing both before and after the accident. The record reflects that there were warning bells ringing at a crossing approximately 120 feet from where the accident occurred.

Following trial, the jury returned its verdict finding Molinar 90% at fault in the accident, and Union Pacific 10% at fault. The trial court thereafter entered a take-nothing judgment in Union Pacific's favor.[2] Arreola filed a motion for new trial, raising many of the same issues that she does on appeal, which was overruled by operation of law. This appeal followed.

## II.  ISSUES ON APPEAL

Arreola raises these arguments on appeal: (1)(a) the trial court erred by failing to declare a mistrial, and by denying her request for a spoliation instruction, when it surfaced mid-trial that Union Pacific had failed to provide her expert with the original horn that had been on the train at the time of the accident in response to her request to have the horn tested; (1)(b) the trial court erred by refusing to allow her expert to explain why he did not test the original horn; (2)(a) the trial court erred by allowing into evidence a broken binocular that conductor Diaz testified he had used to spot Molinar on the tracks, despite Diaz's prior deposition testimony that he had lost the binocular, and that the trial court further erred by denying her motion for a spoliation instruction on this issue; (2)(b) the trial court erred in limiting the testimony of one of Union Pacific's designated corporate representatives relating to the details of the accident; (3) the trial court erred by refusing to give a jury instruction directing the jury to assess Molinar's negligence by the standard of a 16-year-old, rather than by the standard of an adult; (4) the trial court erred by refusing to admit evidence of another accident in which a Union Pacific train struck and killed a teenager walking on the tracks; (5) the jury's verdict was factually insufficient; (6) the trial court's allegedly erroneous rulings constituted cumulative error that led to an improper verdict; and (7) the trial court exhibited a biased demeanor toward Arreola's attorneys that deprived her of a fair

---

[2] *See* TEX.CIV.PRAC.& REM.CODE ANN. § 33.001 ("In an action to which this chapter applies, a claimant may not recover damages if his percentage of responsibility is greater than 50 percent.")

trial. In a cross-point, Union Pacific contends that Arreola's state law claims of negligence were preempted by federal regulations governing the train's operation. Because we reject Arreola's arguments, we decline to address Union Pacific's cross-point.

## III. SUFFICIENCY OF THE EVIDENCE

We start with Issue Five, in which Arreola contends that the jury's verdict finding Molinar 90% negligent in causing the accident, and Union Pacific only 10% negligent, was not factually supported by the record. We disagree.

### A. Standard of Review

When a party attacks the factual sufficiency of an adverse finding on an issue on which she had the burden of proof, she must demonstrate that the adverse finding was against the great weight and preponderance of the evidence. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001) (per curiam). In considering a factual sufficiency challenge, an appellate court "must consider and weigh all of the evidence and can set aside a verdict only if the evidence is so weak or if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust." *Id.* In reviewing the jury's apportionment of negligence percentages, a court of appeals must apply this same standard and review the entire record to determine whether the amounts assigned are against the great weight and preponderance of the evidence. *See Zamarron v. Adame*, 864 S.W.2d 173, 177 (Tex.App.--El Paso 1993, writ denied). In making this determination, we keep in mind that the jury is the sole judge of credibility and demeanor, but that the "jury's decisions regarding credibility must be reasonable." *Cartwright v. Armendariz*, 583 S.W.3d 798, 803 (Tex.App.--El Paso 2019, pet. denied), *citing City of Keller v. Wilson*, 168 S.W.3d 802, 820 (Tex. 2005). Accordingly, "[j]urors cannot ignore undisputed testimony that is

clear, positive, direct, otherwise credible, free from contradictions and inconsistencies, and could have been readily controverted." *Id*, *citing Wilson*, 168 S.W.3d at 820.

"We walk a fine line in conducting a factual sufficiency review, mindful both of our duty not to merely substitute our judgment for that of the jury while at the same time recognizing that our strong deference to a jury's verdict does not make that verdict totally unreviewable." *Id.* at 803, *citing Golden Eagle Archery, Inc.*, 116 S.W.3d at 761. Thus, as this Court has recognized, a court of appeals may not reverse a verdict just because it concludes that the evidence "preponderates" toward a particular answer to a jury question, and instead reversal of a jury's verdict is warranted only when a detailed review of the evidence "indicates that the great weight of that evidence supports" a different answer. *Id.*, *quoting Herbert v. Herbert*, 754 S.W.2d 141, 144 (Tex. 1988).

## B. Applicable Law

In general, when a train crew discovers a person on the tracks, they owe the person a duty to behave "reasonably," including in situations where it becomes apparent that the person "will not extricate himself/herself from danger."[3] *See Barnes v. Kansas City S. Ry. Co.*, No. 4:14-CV-68, 2016 WL 4801511, at *4 (S.D. Tex. Feb. 19, 2016, no pet.). And as the Texas Supreme Court has recognized in discussing the doctrine of "discovered peril," although an engineer should use all "means at his command" to avoid striking a party on the tracks, this is "not necessarily restricted to stopping or slowing the train," and may include "the giving of an alarm by bell or whistle so that the one in peril may have an opportunity to extricate himself." *Texas & N. O. R. Co. v. Krasoff*,

---

[3] The duty might be different for a person trespassing on train tracks. *See Barnes v. Kansas City S. Ry. Co.*, No. 4:14-CV-68, 2016 WL 4801511, at *4 (S.D. Tex. Feb. 19, 2016, no pet.); *Texas Utilities Elec. Co. v. Timmons*, 947 S.W.2d 191, 193 (Tex. 1997) ("The only duty a premises owner or occupier owes a trespasser is not to injure him willfully, wantonly, or through gross negligence."). That said, the trial court did not instruct the jury that Molinar was a trespasser, and instead, instructed the jury that Union Pacific owed him a duty of ordinary care (the "degree of care that would be used by a person or company of ordinary prudence under the same or similar circumstances"). Accordingly, we decide the sufficiency issue based on the jury instructions as given.

191 S.W.2d 1, 3 (1945); *see also Flanigan v. Texas & Pac. Ry. Co.*, 273 S.W.2d 110, 112-13 (Tex.App.--El Paso 1954, writ ref'd n.r.e.) (same); *S. Pac. Transp. Co. v. Peralez*, 546 S.W.2d 88, 94-95 (Tex.App.--Corpus Christi 1976, writ ref'd n.r.e.) (same). In turn, the issue of whether a train crew exercised ordinary care by using all means at their command to avoid an accident is generally a question of fact for the jury to resolve. *See Houston E. & W.T. Ry. Co. v. Sherman*, 42 S.W.2d 241, 244-45 (Tex. Comm'n App. 1931) (question of whether engineer acted as a person of ordinary prudence would have acted under the circumstances is a question to be determined by the jury from all the evidence).

### C. Analysis

Arreola contends that Union Pacific should have been found more negligent than Molinar for two reasons. First, Arreola contends that the record overwhelmingly demonstrates that the train crew was negligent (and therefore primarily responsible for the accident) in using the "wrong horn pattern" to alert Molinar that the train was approaching. In particular, she points out that her expert, audiologist Dr. Michael Seidemann, testified at trial that it would have been more effective for the crew to have blown the horn in a short, staccato pattern, rather than blowing the horn in a long, continuous pattern as Harkness did. She asserts that it was "common knowledge" in his field that "sounds going on and off or sounds that fluctuate in either pitch or loudness, or both of those parameters, are far more attention gathering than sounds that stay on all the time."

This theory, however, was disputed by Union Pacific. In particular, Harkness testified that he blew the horn in a long continuous pattern, as he believed this was the best way to get Molinar's attention. He and others explained that the sound from a train's horn is produced by air traveling through it, and the longer the lever is held down, the more air hits the horn, creating the "loudest tone." Moreover, although Harkness acknowledged during his deposition that he customarily

7

blows the train's horn in a short, staccato pattern when he spots people or livestock on the tracks, the record reflects that there are no rules requiring a train crew to blow the horn in this way. To the contrary, the applicable rules state that the crew is to sound the train's horn when persons or livestock are on the track in an "attempt to attract attention" when the "engineer believes such action is appropriate," without specifying any pattern that the crew must use.

Dr. Seidemann himself acknowledged that Harkness did not violate any rules or regulations by using this horn pattern, and that it was within the train crew's "sole judgment" to determine the best method to attract the attention of a person on the tracks. In addition, at least one other court that has considered the issue has found that blowing the horn in "long, drawn-out sections," rather than in a succession of short bursts, was more than adequate to alert a person of the train's approach. *Sanchez v. Kansas City S. Ry. Co.*, No. CIV.A. H-12-862, 2012 WL 6697574, at *2 (S.D. Tex. Dec. 24, 2012). The jury was thus free to reject Arreola's claim that the train crew was negligent in the way they attempted to alert Molinar of the approaching train.

Second, Arreola contends that the record overwhelmingly supports a finding that Union Pacific was primarily responsible for the accident by failing to engage the emergency brakes immediately and "without hesitation" as soon as Diaz spotted Molinar on the tracks, rather than first using the train's horn as a warning in the hope that he would leave the tracks. According to Arreola, the record reflects that the train crew's delay in engaging the brakes was both against Union Pacific's own policies and was clearly unreasonable. We disagree with both arguments.

In arguing this negligence theory, Arreola acknowledges that the train would not have been able to completely stop even if the crew had engaged the emergency brakes immediately after spotting Molinar on the tracks. Instead, she argues that if they had done so earlier, the train would have at least slowed down, giving Molinar a better opportunity to avoid the impact. How much the

train could have slowed was a disputed issue at trial. Arreola argued that the crew began blowing the horn to warn Molinar at 12:38:06, approximately 42 seconds before the crew engaged the emergency brakes. She therefore estimated that if the brakes were applied immediately after the crew blew the horn, the train would have slowed significantly, to two or three miles an hour prior to impact, potentially giving Molinar additional time to react to avoid the impact. Yet Union Pacific argued that this estimate was based on a miscalculation. Because the train crew began blowing the horn to warn Molinar only 25-27 seconds before the emergency brakes were engaged, Union Pacific contends that the train would not have slowed down significantly before impact.[4] Under Union Pacific's time-line, even if the train's crew had engaged the emergency brakes 19 seconds sooner, the train would have only slowed down by about 10 miles per hour and thus would have been traveling around 38-39 miles per hour at the time of impact. And on appeal, Arreola now acknowledges that the time could have been as short as 20 seconds before the brakes were applied, but she still contends that engaging the brakes 20 seconds earlier could have made a difference in saving Molinar's life.[5]

At trial, Harkness and Diaz both explained that they did not immediately engage the emergency brakes for three reasons. First, they anticipated that Molinar would hear the horn and leave the track. They explained that often in their experience individuals standing on or near the tracks will move off the tracks upon hearing the train's horn. Second, Harkness added that a train

---

[4] The timing issue turns on when Harkness blew the horn to warn Molinar, as opposed to when he blew the horn at the last street crossing in Marfa. According to Union Pacific, Arreola based her timing argument on the time stamp for the horn at the street crossing which overstates the amount of time available to apply the brakes.

[5] Arreola first argued in her brief that the train crew began blowing the horn "over forty seconds" before the crew engaged the emergency brakes. Union Pacific, however, responded, as it did at trial, that this estimate was incorrect, as the train's camera showed that the crew could not have seen Molinar until approximately 27 seconds before the accident, and that the record reflects that the horn began blowing 23 seconds before impact. In her reply brief, Arreola appears to acknowledge that her time estimate was incorrect, but argues that even if Union Pacific's estimate of around 20 seconds was correct, it was still negligent for the crew to wait even that long to pull the emergency brake once they realized that a person was on the tracks.

crew must consider the possibility of derailment before applying the emergency brakes, noting that in this case, the train was carrying "hazardous materials," including LPG, which he described as a "very flammable, dangerous product," and which would pose a danger in a populated area if the train derailed. As well, he pointed out that the rear portion of the train was still coming around the curve when they spotted Molinar on the tracks, thereby increasing the danger of a derailment. Third, Harkness explained that the train itself was approximately a mile and a half long, and given the train's speed, it would have been impossible for the train to have stopped prior to impact even if they had pulled the emergency brakes sooner.

As for Arreola's claim that the crew violated company policy, Union Pacific has two written rules on emergency braking. One rule states: "When emergency braking is necessary to protect life or property, use the maximum braking effort available consistent with safe train handling techniques." Another rule provides that: "When conditions warrant, use an emergency brake application without hesitation" and leave the brake on until the train stops. These rules make clear that the train crew need not engage the emergency brakes without first considering the circumstances they are facing.

As Harkness explained at trial, the rules require the crew to use their discretion in engaging the emergency brakes. They must do so in accordance with safe train handling techniques, which he explained includes avoiding derailment that could occur by sudden braking. Harkness added that due to the possibility of derailment, it is not always reasonable, nor even safe, for a train to immediately engage its emergency brakes every time the crew spots a trespasser on the tracks. Instead, he testified that it complies with Union Pacific's policy, and with safe train handling techniques, to first seek to alert a person to leave the tracks, and to only engage the emergency brakes when the crew realizes that the person is not going to heed the warning.

10

Accordingly, the record does not support Arreola's contention that the train crew violated any rules or policies in first trying to warn Molinar to evacuate the tracks before engaging the emergency brakes. Nor do we find that the record proves that the train crew acted unreasonably in following this course of action. In *Barnes*, the court encountered a similar situation in which the plaintiffs sued a railroad company, alleging that its train crew acted unreasonably in first seeking to warn a group of trespassers walking on the train tracks by blowing the train's horn before engaging the emergency brakes. *See Barnes*, 2016 WL 4801511, at *4 (applying Texas law). The court, however, granted the defendant railroad's motion for summary judgment, finding, as a matter of law, that the engineer in that case did *not* act negligently or violate any duties of due care in doing so. *Id.* In making that determination, the court relied on the following statement by the Texas Supreme Court: "[W]here one is discovered some distance ahead of a train, and a timely warning is given, those in charge of the train can presume that such a person is in possession of all his faculties and that prompted by instinct of self-preservation, he will leave the track and place himself beyond the reach of danger in time to escape injury[.]" *Id. at *3, quoting Sisti v. Thompson*, 229 S.W.2d 610, 615 (Tex. 1950); *see also Flanigan*, 273 S.W.2d at 115 (Fraser, J. concurring) (referring to the court's pronouncement in *Sisti*, as a "well-established" doctrine); *see also Krasoff*, 191 S.W.2d at 3 (recognizing that a train crew may act reasonably upon discovering a person on the tracks by giving a warning so that the person has a chance to extricate himself from the danger, rather than by trying to slow or stop the train).

The court in *Barnes* therefore held that because the trespassers in that case appeared to be in control of their faculties, the train's crew was reasonable in assuming the trespassers would leave the tracks upon being warned of the train's approach, and in only engaging the emergency brakes when they realized the trespassers were not responding. *Id*. In so holding, the court also

11

observed that it would be "unreasonable for engineers to be forced to throw a 10,000 ton train into an emergency stop every time they saw someone on the tracks, especially when the individuals appear to be awake and have every opportunity to move from the tracks." *Id.*; *see also Sanchez,* 2012 WL 6697574, at *2 (recognizing that a train crew cannot pull the emergency brakes every time they spot a trespasser on the tracks).

In arguing that the jury's apportionment of negligence was against the great weight and preponderance of the evidence, Arreola relies primarily on our ruling in *Cartwright v. Armendariz,* where we found that the evidence was factually insufficient to support a jury's take-nothing verdict for the defendant in a single vehicle auto-accident case. 583 S.W.3d at 805. In that case, however, there was no evidence to support the jury's finding that the defendant was not at fault in the parties' accident. One of the plaintiffs testified that the defendant caused the accident by running a stop sign while using a cell phone. *Id*. at 802. The defendant, who could not remember the cause of the crash, "never put on any conflicting evidence" to answer that evidence. *Id.* at 802, 804. Thus, because there was no disputed evidence in the record that the jury could have relied on in reaching its verdict in the defendant's favor, we concluded that the "jury's verdict was contrary to the great weight and preponderance of the evidence." *Id.* at 805.

At best, this case presents conflicting evidence on the parties' proportionate negligence in causing the accident. Arreola does not dispute that Molinar was walking on the tracks wearing headphones, which impeded his ability to hear any warning from the approaching train. In fact, Arreola's own expert audiologist, Dr. Seidemann, testified that headphones can be turned up so loud that a person might not hear a train until it was "right on top of you." When the train crew spotted Molinar on the tracks, they could not see that he was wearing headphones, and they were therefore justified in assuming that he was in control of his faculties and would respond to the

warning being given by the train's horn. Therefore, the jury could have determined that the train crew acted reasonably by first providing Molinar with a warning, and by waiting to engage the emergency brakes when they realized he was not hearing that warning. As well, the jury could have determined that even if the crew had engaged the emergency brakes as soon as they spotted Molinar on the tracks, the outcome would have been the same, as the undisputed evidence established that it was impossible for the train to have come to a complete stop before the point of impact. Thus, we cannot say that the jury's finding that Molinar was 90% at fault in the accident, and that Union Pacific was only 10% at fault, was against the great weight and preponderance of the evidence.

Finally, Arreola also argues that the jury's finding that Molinar suffered no damages before he died was not factually supported by the record, and was "manifestly unjust" and "shocks the conscience." In particular, Arreola points out that the recording from the video camera revealed that Molinar turned to see the train approaching him a second before the impact, and she argues that he therefore suffered "mental anguish" before he died. But because of the jury's finding that Molinar was 90% negligent, even if the jury had found that he suffered any such mental anguish, the trial court would have still been required to enter a take-nothing judgment in Union Pacific's favor due to the 50-percent bar rule, which prohibits a plaintiff from recovering if he is found to have been more than 50% negligent. *See* TEX.CIV.PRAC.& REM.CODE ANN. § 33.001 ("In an action to which this chapter applies, a claimant may not recover damages if his percentage of responsibility is greater than 50 percent."). Accordingly, Arreola's argument lacks relevance to our disposition of the appeal.

Arreola's Issue Five is overruled.

## IV. TESTING THE HORN

In Issue One, Arreola makes multiple complaints about an issue that arose at trial when her attorneys realized that their expert witness, Dr. Seidemann, tested a different horn on the subject locomotive from the one involved in the accident. Union Pacific had taken the original horn off the locomotive and stored it for safekeeping shortly after the accident. Union Pacific then installed a different horn and the locomotive was put back in service. Years later, Dr. Seidemann ended up testing that replacement horn. Before discussing the merits of her various arguments on this topic some background information is needed.

### A. Background

Five days after the accident, Union Pacific tested the horn that had been on the locomotive involved in the accident to ensure that it had been operating at the correct decibel level as required by federal regulations. The test results, which were admitted into evidence at trial, showed that the horn was operating at a level above the minimum 96 decibel level required by the regulations.[6] The horn was then placed in a Union Pacific vault for safekeeping, and a new horn (the substitute horn) was placed on the locomotive when it was placed back into service.[7]

Almost three years later, Arreola submitted a first of a series of discovery requests to Union Pacific seeking to inspect the locomotive involved in the accident. Although Union Pacific agreed to the inspection, it rescheduled the dates and locations for the inspection several times due to the locomotive's schedule, as it was traveling around the country. The record reflects that Arreola's initial requests only sought inspection of the locomotive itself. However, on September 3, 2019,

---

[6] The test results indicate that Union Pacific took six sample readings, with only one result falling below 96 decibels, reading at 95.8. The average of the six readings, however, was 97.0, making it in compliance with federal regulations.

[7] At trial, as well as on appeal, Arreola incorrectly argued that Union Pacific did not test the original horn at that time, and that it instead tested the "new horn" after the accident. This, however, is not borne out by the record, as the repair records state that the horn was "removed by claims after horn test [and] replaced."

14

Arreola's attorney sent Union Pacific an "Amended Notice of Inspection," making it clear that Arreola wanted her experts to test the horn that had been on the subject train.[8] Later, Arreola's attorneys sent Union Pacific three similarly worded requests. The inspection finally took place in Dupo, Illinois on September 20, 2019. The month before the inspection, in August 2019, Union Pacific produced the train's repair records in response to Arreola's discovery requests, revealing that the horn had been taken off the train shortly after the accident and replaced with the substitute horn. However, when Dr. Seidemann appeared for the inspection, he was unaware that this had occurred. He believed that he was testing the original horn at the September 20th inspection when in fact he was testing the substitute horn.

Arreola's attorneys were also apparently unaware that Union Pacific had not produced the original horn for testing until the second day of trial. The matter surfaced when Arreola's attorneys questioned a former Union Pacific employee, Mark Pollan, about the repair records for the train, which Arreola's attorney had introduced into evidence. In response to counsel's questioning, Pollan pointed out that the records reflected that Union Pacific's claim department had requested that a decibel test be performed on the horn involved in the accident. He added that the records reflected that the test occurred five days after the accident, and that the claims department thereafter removed the horn from the train and "replaced" it with another horn. On cross examination, Union Pacific confirmed with Pollan that the horn had in fact been replaced after the

---

[8] The request stated as follows:

> "PLEASE TAKE NOTICE that an inspection for the lead locomotive involved in this incident . . . has been rescheduled for September 18, 2019 at 3:00 p.m. (MDT).

> Included in this inspection, Plaintiffs experts will be inspecting the subject locomotive, including the horns, and other components as well as the gauges in the locomotive cab. Sound level measurements will be done in front of the locomotive, so this must occur in an area that conforms to the FRA requirements with regard to no nearby loud noise sources or sound reflective surfaces. A railroad representative should be present and available in the locomotive to operate the horn."

accident. Arreola's attorney then asked Pollan on redirect whether he believed it was important to test the correct horn. When counsel began to insinuate that it would have been "deceptive" for Union Pacific to have produced a "different horn" for testing, Union Pacific objected and requested a bench conference.

At the ensuing bench conference, Arreola's attorneys accused Union Pacific of replacing the horn on the train without informing them, and of failing to inform them that the horn produced at the September 2019 inspection was a substitute horn. Counsel subsequently called Dr. Seidemann to testify outside the presence of the jury that Union Pacific failed to inform him that he was not testing the original horn when he travelled to Illinois for the inspection, and that he learned for the first time during trial that he had tested the substitute horn. Further, Union Pacific's attorney acknowledged that he had also been unaware at the time of the inspection that the testing was done on the substitute horn.

Arreola's attorneys, however, acknowledged that Union Pacific's counsel had produced the train's repair records to them almost a month before the inspection, and that the records stated that the horn had been replaced after testing in 2016.[9] Arreola's attorneys pointed out, however, that the documents produced at that time were voluminous, consisting of ten boxes, and the entries for the horn's replacement were in a small font and difficult to read. According to counsel, it was not until the first night of trial that he noticed the entries showing that the horn had been replaced.

Arreola's attorneys then requested as a sanction that they be allowed to inform the jury that Dr. Seidemann was prevented from testing the original horn due to Union Pacific's failure to disclose that they had produced the wrong horn for testing.[10] The court ruled that Arreola's

---

[9] Despite this admission, both at trial, as well as on appeal, Arreola incorrectly argues that these documents were received after the inspection took place.

[10] Arreola also argued that as another sanction, Union Pacific should not be permitted to make "any kind of reference to the horn" in presenting its case, and should not be permitted to "produce experts," such as audiologists," to "talk

attorneys would be permitted to inform the jury that Dr. Seidemann had not tested the original horn, but that they could not inform the jury of the reason, stating that it would be improper to have a "discovery fight" played out in front of the jury. The trial court stated that these kinds of discovery disputes should have been resolved before trial.[11] In reaching that determination, the trial court found it significant that in August 2019 Union Pacific had provided Arreola's attorneys with the repair records showing that the horn had been replaced. And finally, the trial court stated that if the issue had been raised before trial, the court would have been inclined to grant Arreola a continuance so she could inspect the original horn.

On the third day of trial, Arreola filed a written motion for sanctions, arguing that Union Pacific had effectively "concealed" the original horn from her during the discovery process, and sought a spoliation instruction that would have instructed the jury as follows:

> Union Pacific destroyed or failed to preserve the horn which was on the freight train which struck [Molinar] . . . . You must consider that this evidence would have been unfavorable to Union Pacific on the issue of whether the horn was sufficiently loud enough to warn [Molinar] of an approaching train.

She also sought "death penalty sanctions" for what she described as Union Pacific's "blatant contempt for the rule of law" in withholding key evidence in her case, asking the court to deem all of Union Pacific's defenses "to be waived." Finally, she asked the court to "require Union Pacific to pay all fees and costs incurred by Plaintiffs in requesting the inspection, performing the inspection, rendering expert opinions on the false evidence, and bringing forth this motion." After

---

about the horn." Union Pacific, however, did not produce any experts to testify about the horn, thereby rendering that argument moot.

[11] Despite this ruling, Arreola's attorney argued during closing arguments, without objection, that the train's repair records showed that Union Pacific took the horn off the train and that it then "disappear[ed]," and asked the jury why Union Pacific would have hidden the horn if it had not been defective.

permitting Arreola's attorneys to put forth their bill of exceptions, the trial court issued an order denying all of Arreola's oral and written requests for sanctions.

## B. Arreola Failed to Request a Mistrial

On appeal, Arreola first argues that the trial court erred by "refusing to grant a mistrial" based on Union Pacific's alleged gamesmanship in "concealing" the original horn from her during discovery. Union Pacific counters that Arreola never made a request for a mistrial in the trial court and contends that she therefore may not raise this issue on appeal. We agree with Union Pacific.

Rule 33.1 provides that "[a]s a prerequisite to presenting a complaint for appellate review, the record must show that: (1) the complaint was made to the trial court by a timely request, objection, or motion . . . [and] (2) the trial court: (A) ruled on the request, objection, or motion, either expressly or implicitly; or (B) refused to rule on the request, objection, or motion, and the complaining party objected to the refusal." TEX.R.APP.P. 33.1. Arreola never requested a mistrial, and instead requested other "sanctions," including death penalty sanctions, financial penalties, and a spoliation instruction.[12] The general rule is that a party waives the right to complain on appeal about the trial court's failure to grant a mistrial without any request for such. *See Petroleum Workers Union of the Republic of Mexico v. Gomez*, 503 S.W.3d 9, 37 (Tex.App.--Houston [14th Dist.] 2016, no pet.) (party waived error on appeal when it failed to request a mistrial or other relief based on the allegedly improper admission of evidence at trial); *Cook v. Sabio Oil & Gas, Inc.*, 972 S.W.2d 106, 112 (Tex.App.--Waco 1998, pet. denied) (same). Arreola does not explain

---

[12] Arreola suggests in her brief that she moved for a mistrial in her written motion for sanctions, but that motion did not request a mistrial. She also contends that she orally moved for a mistrial during trial, but we find no such oral motion in the record.

how we can consider this issue without such a request.[13] We therefore conclude that she failed to preserve this issue for our review.

## C. The Spoliation Instruction Would Have Been Improper

Next, Arreola contends that the trial court erred in refusing her request for a spoliation instruction which would have informed the jury that Union Pacific had either destroyed or failed to preserve the horn, and that the jury must therefore conclude that "this evidence would have been unfavorable to Union Pacific on the issue of whether the horn was sufficiently loud enough to warn [Molinar] of an approaching train." She contends that the trial court committed reversible error in refusing to give this instruction to the jury. We disagree.

### 1. Applicable Law and Standard of Review

Spoliation is a particularized form of discovery abuse that ultimately results in the failure to produce discoverable evidence. *Brookshire Bros., Ltd. v. Aldridge*, 438 S.W.3d 9, 18 (Tex. 2014). A party alleging spoliation first bears the burden of establishing that the nonproducing party had a duty to preserve the evidence, and second, to demonstrate that "the other party breached its duty to preserve material and relevant evidence." *Id.* at 20, *citing Wal-Mart Stores, Inc. v. Johnson*, 106 S.W.3d 718, 722 (Tex. 2003). The Texas Supreme Court has explained that a duty to preserve evidence arises "when a party knows or reasonably should know that there is a substantial chance that a claim will be filed and that evidence in its possession or control will be material and relevant to that claim." *Id.* Here, the horn was material evidence and Union Pacific therefore had a duty to preserve it. So we focus on the second element—breach of the duty.

A party cannot breach its duty to preserve evidence, without at least acting negligently. *Petroleum Sols., Inc. v. Head*, 454 S.W.3d 482, 488 (Tex. 2014), *citing Brookshire Bros.*, 438

---

[13] Union Pacific raised waiver in its brief, and Arreola did not address that issue in her reply brief.

19

S.W.3d at 20-21 & n.8. And the court has further observed that, assuming a trial court finds that spoliation has occurred, the trial court "may impose an appropriate remedy." *Brookshire Bros.*, 438 S.W.3d at 21. In this regard, Rule 215.2 of the Texas Rules of Civil Procedure "enumerates an array of remedies available to a trial court when addressing a discovery abuse, such as an award of attorney's fees or costs to the harmed party, exclusion of evidence, striking a party's pleadings, or even dismissing a party's claims," all of which are available in the "spoliation context." *Id.*, *citing* TEX.R.CIV.P. 215.2-215.3; *Trevino v. Ortega*, 969 S.W.2d 950, 953 (Tex. 1998). The court has further noted that a trial court "has discretion to craft other remedies it deems appropriate," depending on the circumstances, but the court must ensure that the remedy for an act of spoliation has a "direct relationship" to the act itself and is not "excessive." *Brookshire Bros., Ltd.*, 438 S.W.3d at 21. In determining the proper remedy, the court should weigh the "culpability of the spoliating party and the prejudice to the nonspoliating party." *Id.* [14]

In some cases, a trial court has the discretion to provide the jury with a spoliation instruction informing the jury that it may presume that the "missing evidence would have been unfavorable to the spoliator." *Id.* at 21-22. Yet the *Aldridge* court recognized that a spoliation instruction is "among the harshest sanctions a trial court may utilize to remedy an act of spoliation," as it has the "propensity to tilt a trial in favor of a nonspoliating party [and] it can, in some sense, be tantamount to a death-penalty sanction." *Id.* at 23, *citing Wal-Mart Stores*, 106 S.W.3d at 724; *TransAmerican Nat. Gas Corp. v. Powell*, 811 S.W.2d 913, 917-918 (Tex. 1991). At the same time, the court has recognized that the "destruction of relevant evidence can also

---

[14] In particular, a trial court should assess the following: "(1) the degree of fault of party who failed to preserve evidence, (2) the degree of prejudice suffered by the opposing party, and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party." *Brookshire Bros., Ltd.*, 438 S.W.3d at 21. "Prejudice is evaluated based on the spoliated evidence's relevance to key issues in the case, whether the evidence would have been harmful to the spoliating party's case (or, conversely, helpful to the nonspoliating party's case), and whether the spoliated evidence was cumulative of other competent evidence that may be used in its stead." *Petroleum Sols., Inc. v. Head*, 454 S.W.3d 482, 489 (Tex. 2014), *citing Brookshire Brothers*, 438 S.W.3d at 21-22.

unfairly skew the outcome of a trial." *Brookshire Bros., Ltd.*, 438 S.W.3d at 23. Thus, it has observed that the improper grant or denial of a spoliation instruction can deprive a party of the right to a fair trial, and it "follows that an instruction should be available to address spoliation in certain circumstances, but should be used cautiously." *Id.* at 23, *citing TransAmerican*, 811 S.W.2d at 917. The court has accordingly held that a spoliation instruction is proper only if the trial court finds that: "(1) the spoliating party acted with intent to conceal discoverable evidence, or (2) the spoliating party acted negligently and caused the nonspoliating party to be irreparably deprived of any meaningful ability to present a claim or defense."[15] *Petroleum Sols., Inc.*, 454 S.W.3d at 489, *citing Brookshire Bros.*, 438 S.W.3d at 23-26.

Subject to these considerations, we employ an abuse of discretion standard when reviewing a trial court's decision to grant or deny a spoliation instruction. *Telesis/Parkwood Ret. I, Ltd. v. Anderson*, 462 S.W.3d 212, 254 (Tex.App.--El Paso 2015, no pet.), *citing Brookshire Bros., Ltd.*, 438 S.W.3d at 27; *see also Am. Flood Research, Inc. v. Jones*, 192 S.W.3d 581, 583 (Tex. 2006) (recognizing that in general a trial court has the discretion to determine whether to impose a sanction for a discovery abuse subject to review for an abuse of discretion). In determining whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles; in other words, we must decide whether the act was arbitrary or unreasonable. *Telesis/Parkwood Ret. I, Ltd.*, 462 S.W.3d at 254. Although a trial court may decide a matter within its discretion in a different manner than an appellate court would in a similar circumstance, that does not necessarily mean that an abuse of discretion has occurred. *Id.*, *citing Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985) (discussing the test

---

[15] As well, the court has held that this same standard applies to "limit a trial court's discretion to issue other remedies akin to death-penalty sanctions, such as striking a party's claims or defenses." *Petroleum Sols.*, *Inc.*, 454 S.W.3d at 489.

21

for abuse of discretion). In addition, a trial court's error in determining whether to give a spoliation instruction is reversible only if it probably caused the rendition of an improper judgment. *Id.*, *citing Brookshire Bros., Ltd.*, 438 S.W.3d at 29.

### 2. *Analysis*

Union Pacific argues that it fulfilled its duty to preserve the original horn by storing it in an evidence vault for the three years pending trial. Arreola, on the other hand, argues that the original horn was hidden or "concealed" from her, pointing out that Union Pacific failed to inform her expert that he was testing the wrong horn. She further argues that this alleged concealment was a form of spoliation. We agree with Arreola that spoliation can occur not only when a party has destroyed evidence, but also when a party has intentionally hidden or concealed material evidence from the other party. *See generally Brookshire Bros.*, 438 S.W.3d at 23-24 (recognizing that a spoliation instruction "is based on the presumption of wrongdoing, so it follows that the more appropriate requirement is intent to conceal or destroy discoverable evidence"); *Petroleum Sols., Inc.*, 454 S.W.3d at 489-90 (finding no spoliation where there was no proof that the defendant "intentionally concealed evidence"). Still, even if we were to assume that Union Pacific concealed the original horn from Arreola's attorneys, we cannot conclude that the concealment was intentional or that it otherwise caused Arreola to be irreparably deprived of any meaningful ability to present a claim or defense, such that reversal of the jury's verdict is required. *Petroleum Sols., Inc.*, 454 S.W.3d at 489.

First, we find no evidence in the record to support a finding that Union Pacific intentionally concealed the horn from Arreola or her experts at the time of the inspection; instead, the record reflects that if anything, both parties were equally at fault in ensuring that the proper horn was tested. Although we recognize that Arreola's attorneys expressly stated in their discovery requests

22

that they sought to conduct sound tests on the original horn, nothing in the record suggests that Union Pacific acted to intentionally conceal evidence when it instead produced the substitute horn at the inspection. As set forth above, Union Pacific's own attorney stated at trial that he had been unaware that the original horn had not been produced at the inspection when the issue arose at trial. Three years had passed between the time the original horn was removed and Arreola requested to inspect the locomotive, and then only in an amendment to that request did she seek to test the horn. In addition, Union Pacific provided Arreola's attorneys with the train's repair records before the inspection that expressly stated that it had "replaced" the original horn on the locomotive shortly after the accident. At a minimum, the records would have alerted Arreola of the need to verify that the locomotive that was produced at the inspection had the original horn on it.[16] Additionally, Union Pacific provided Arreola with copies (which contained the original horn's serial number) of the tests that it performed on the horn before it was replaced. Arreola's experts had the opportunity at the inspection to verify whether they were testing the original horn simply by looking at the horn's serial number. As such, we cannot conclude that Union Pacific *intentionally* sought to trick Arreola's experts into testing the wrong horn.

Second, we cannot say that Union Pacific's failure to produce the original horn at the inspection was so prejudicial to Arreola's case that she was "irreparably deprived of any meaningful ability to present a claim or defense," such that a spoliation instruction would have been a proper remedy. *See Petroleum Sols., Inc.*, 454 S.W.3d at 489. The video from the locomotive, which was played to the jury, had an audio portion that demonstrated there was an audible horn sounding as the train approached Molinar. At trial Arreola acknowledged that the

---

[16] In her brief, Arreola contends that Union Pacific did not inform her that it had replaced the defective horn with a new one before the inspection. As discussed above, however, the record belies this contention, as the repair records that Union Pacific gave to Arreola the month before the inspection state that the horn had been "replaced" after the accident.

23

train crew blew the horn in a continuous manner prior to engaging the emergency brakes, and her theory at trial was that this was the wrong horn pattern to use, as it was ineffective to alert Molinar to the danger of the approaching train. Moreover, she never suggested the alternative theory that she raises on appeal—that the train's horn was simply not loud enough for Molinar to hear it.

The record also contains evidence that Union Pacific tested the original horn shortly after the accident, and those test results showing that the horn passed inspection were submitted into evidence at trial. In addition, Mark Pollan testified at trial as to the validity of the test results, and the fact that the horn performed at the minimum decibel level required by federal regulations. Arreola, however, failed to challenge the validity of the test results.

We therefore conclude that Union Pacific's failure to produce the original horn at the time of the September inspection did not "irreparably deprive" Arreola of her ability to present her claim to the jury that Molinar was not adequately warned of the train's approach. Thus, we cannot say that the trial court abused its discretion in refusing to give a spoliation instruction under these circumstances. For these reasons, we reject Arreola's argument the trial court's failure to provide her requested spoliation instruction warrants a reversal of the trial court's judgment.

Arreola's Issue One-A is overruled.

## V.   THE LIMITATIONS ON DR. SEIDEMANN'S TESTIMONY

In Issue One-B, Arreola argues that the trial court erred in limiting her expert witness, Dr. Seidemann, from testifying on two topics: (1) why he did not test the original horn at the inspection; and (2) his opinion that the train's repair records reflected that the train's horn had been

malfunctioning before the accident and had not been repaired. [17] We disagree with both arguments.

### A. Standard of Review

We review a trial court's exclusion of evidence under an abuse of discretion standard. *See JLG Trucking, LLC v. Garza*, 466 S.W.3d 157, 161 (Tex. 2015); *see also Kia Motors Corp. v. Ruiz*, 432 S.W.3d 865, 879 (Tex. 2014). A trial court abuses its discretion when it acts without regard for guiding rules or principles. *U-Haul Int'l, Inc. v. Waldrip*, 380 S.W.3d 118, 132 (Tex. 2012). In all events, a trial court's error in excluding evidence is reversible only if it probably caused the rendition of an improper judgment. *JLG Trucking, LLC*, 466 S.W.3d at 165, *citing* TEX.R.APP.P. 44.1(a)(1); *see also DeAnder & Felhaber, LP v. Montgomery*, 615 S.W.3d 352, 356 (Tex.App.--El Paso 2020, pet. denied) (even if a trial court's evidentiary ruling is an abuse of discretion, reversal is appropriate only if the error was harmful). An appellate court must uphold a trial court's evidentiary ruling if there is "any legitimate basis for the ruling." *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998).

### B. Testimony about Inspection of the Horn

Arreola first contends that the trial court abused its discretion by refusing to allow Dr. Seidemann to testify that he had been unable to test the original horn due to Union Pacific's actions in producing a substitute horn at the inspection. As set forth above, the trial court permitted Dr. Seidemann to testify that he had not tested the original horn but ruled that he could not testify

---

[17] Arreola further contends that Dr. Seidemann should have been permitted to testify that "Union Pacific, though involved in hundreds of other similar cases, had never before implemented a policy of removing and storing a horn involved in a fatal collision, as it did in this case." Dr. Seidemann, however, never testified to that fact in Arreola's bill of exceptions. Instead, he testified that he had never been involved in a situation in which he had been given the wrong equipment for testing. We therefore do not consider this argument in our analysis as it was not preserved for our review. *See Hernandez v. Moss*, 538 S.W.3d 160, 166 (Tex.App.--El Paso 2017, no pet.) (in order to preserve the issue of whether testimony was improperly excluded, the appellant must make an offer of proof or a bill of exception to show what the witness's testimony would have been).

about the reason why; the trial court did not intend to have a "discovery fight" played out in front of the jury. Arreola argues that the trial court's exclusion of Dr. Seidemann's testimony on this topic was "prejudicial and erroneous," relying on the Texas Supreme Court's holding in *State v. Cent. Expressway Sign Assocs.*, 302 S.W.3d 866, 870-74 (Tex. 2009). That case, however, does not fit as it merely holds that a trial court may abuse its discretion by excluding expert witness testimony that has a "reliable foundation," and is relevant to the issues in a case. *Id*. at 870. In contrast, Arreola was not attempting to question Dr. Seidemann in his capacity as an expert witness to elicit expert witness testimony from him. Instead, Arreola was seeking to question Dr. Seidemann about a discovery issue relating to her claim of spoliation.

This distinction is important because, as the trial court correctly observed, it would have been improper for the parties to litigate a discovery dispute in front of the jury. The Texas Supreme Court has recognized that spoliation is an "evidentiary concept," rather than a cause of action, and "the trial court, rather than the jury, must determine whether a party spoliated evidence and, if so, impose the appropriate remedy." *Brookshire Bros., Ltd.*, 438 S.W.3d at 20, *citing Trevino*, 969 S.W.2d at 954 (Baker, J., concurring); *Massie v. Hutcheson*, 270 S.W. 544, 545 (Tex. Comm'n App. 1925, holding approved) (stating that determining whether a party intentionally destroyed evidence is a preliminary question for the court to decide). The court has further explained that giving the trial court sole responsibility to rule on spoliation issues ensures that the "jury's focus stays where it belongs—on the merits." *Brookshire Bros., Ltd.*, 438 S.W.3d at 20 (holding that it is improper for the trial court to hold spoliations hearings in the jury's presence).

Our sister court in Houston recognized that a trial court should avoid allowing the jury to even *indirectly* consider whether evidence has been spoliated. In *Johnson v. Nat'l Oilwell Varco, LP*, 574 S.W.3d 1, 17 (Tex.App.--Houston [14th Dist.] 2018, no pet.), the defendant employer had

26

destroyed a video that purportedly showed an incident that led to the plaintiff employee's termination. *Id.* at 12. The plaintiff argued that the destruction was intentional, and requested a spoliation instruction, or in the alternative, permission to inform the jury that the defendant had destroyed the video, without referencing whether the destruction was intentional. *Id.* at 17. The trial court rejected both requests. On appeal, the Houston court found that the trial court did not abuse its discretion. *Id.* at 16-17. Significant to our analysis, the court held that it would have been improper to inform the jury of the video's destruction, as this "approach would have essentially left it up to the jury to determine whether spoliation occurred and what to make of the video's destruction," in violation of the Texas Supreme Court's directive that "the trial court, rather than the jury, must determine whether a party spoliated evidence and, if so, impose the appropriate remedy." *Id.* at 17, *quoting Brookshire Brothers*, 438 S.W.3d at 20.

Similarly, if Dr. Seidemann had been permitted to testify about Union Pacific's failure to produce the correct horn for testing, this would have opened the door to allowing the jury to determine whether Union Pacific had spoliated evidence, a matter not within its province. *Brookshire Bros., Ltd.*, 438 S.W.3d at 20; *see also Telesis/Parkwood Ret. I, Ltd.*, 462 S.W.3d at 253 (recognizing that "discovery matters" are within the trial court's sole province). In addition, it would have also opened the door to a prolonged debate about whether the evidence had in fact been spoliated and would have taken the jury's focus away from the true issue in the case—whether Union Pacific acted negligently on the day of the accident.

We thus conclude that the trial court did not abuse its discretion in prohibiting Dr. Seidemann from testifying on this issue.

### C. Testimony about the Horn's Repair Records

Arreola next contends that the trial court erred in prohibiting Dr. Seidemann from expressing his opinion that the train's repair records reflected that the train's horn was "defective," as it had been malfunctioning before the accident and had allegedly never been repaired. We conclude, however, that this issue was not properly preserved for our review.

By way of background, the train's repair records, which Arreola introduced into evidence, contained two entries dated July 4, 2016, both of which were in a "defect/repair" column stating: (1) "exam defect," with the following notation: "miscellaneous-ed defective horn/bell," and (2) "troubleshoot," with a notation stating, "horn operation." Both entries indicate that the repair status was still open on that date, with another note stating: "[t]o be completed at the Diesel Ramp." However, the records also contain an entry on July 5, 2016, saying that an examination was conducted that day, that there was no defect in the horn, and that the problem related to the "horn bonnet" and had been "completed." At trial, Pollan explained that the term "horn bonnet" refers to the fabric that is placed over the top of the horn's "trumpets" to prevent debris and bugs from getting inside the horn itself. Pollan believed that the records reflected that the horn "must have had a ripped bonnet" and needed to be replaced.[18] He also opined that the problem had in fact been resolved as the records contained an entry specifying that the issue had been "completed."

Arreola, however, apparently believed that the issue had not in fact been satisfactorily resolved before Molinar's accident, and sought to have Dr. Seidemann testify that the repair records reflected that the horn was "defective." Union Pacific objected, arguing that Dr. Seidemann did not discuss the repair records in his expert witness report, and therefore, it

---

[18] The records indicate that a horn test was also performed on August 30, 2016, which Pollan believed was conducted in a routine manner after the train was involved in another incident. The records indicate that the horn test was successfully completed.

would be improper for him to provide an opinion on the records at trial. In addition, Union Pacific pointed out that Dr. Seidemann's testimony would have been cumulative, as the repair records were already in evidence and had been sufficiently explained by Pollan's testimony. The trial court agreed, again pointing out that Arreola's attorneys had the repair records since August 2019, but "didn't do anything" with them before trial. Later, when Arreola made a bill of exceptions for this issue, she only questioned Dr. Seidemann about the discovery issues relating to the horn and did not question him on how he interpreted the repair records or, more specifically, whether he believed the records reflected that the horn was defective.

To preserve an argument that the trial court improperly excluded evidence, the proponent of the evidence must offer the evidence and secure an adverse ruling from the court. *See Perez v. Lopez*, 74 S.W.3d 60, 66-67 (Tex.App.--El Paso 2002, no pet.), *citing* TEX.R.EVID. 103. Without such an offer of proof, there is nothing for an appellate court to review. *Id*.; *see also Hogg v. Lynch, Chappell & Alsup, P.C.*, 553 S.W.3d 55, 67 (Tex.App.--El Paso 2018, no pet.) ("The party complaining about the exclusion of evidence must show by either a bill of exception or an offer of proof the substance of the evidence excluded."). Here, although Arreola's attorneys generally asserted that Dr. Seidemann would have testified that in his opinion, the repair records reflected a defect with the train's horn, we have no way of knowing whether he did in fact hold this opinion or what evidence he had to support the opinion. Without any offer of proof, we have no way to determine whether Dr. Seidemann's testimony would have had any impact on the jury. *See Quiroz v. Llamas-Soforo*, 483 S.W.3d 710, 722 (Tex.App.--El Paso 2016, pet. dism'd) (while a reviewing court may be able to discern from the record the nature of the evidence and the propriety of the trial court's ruling, without an offer of proof, the court can never determine whether exclusion of

the evidence was harmful). We therefore conclude that Arreola failed to preserve this issue for our review.

Arreola's Issue One-B is overruled.

## VI.    THE DELAY IN PRODUCING THE BINOCULAR

In Issue Two-A, Arreola argues that: (1) the trial court erred in admitting evidence of the binocular that Conductor Diaz claimed he used to determine there was a person on the tracks, and (2) the trial court should have provided a spoliation instruction to the jury for either Union Pacific's delay in producing the binocular, or its alleged failure to produce the actual binocular that Diaz used on the day of the accident. We reject both arguments, but first provide some needed background on this issue.

### A.  Background

During his deposition in April 2018—almost two years after the accident—Diaz testified that on the day of the accident, he had with him one half of a "toy" binocular that belonged to his daughter. He explained that after she broke the binocular, she gave him the half that he used that day. Although he did not describe the broken binocular in detail, he testified that it was made of plastic, and was the type that could be bought in the "toy department" at Wal-Mart. He added that although he did not know the binocular's magnification, he described it as being like a "magnifying glass," and asserted that it only provided "a little bit" of clarification. According to Diaz, on the day of the accident, he used the broken binocular in the manner of a "monocular" by placing it up to his eye after the engineer spotted the red object on the tracks, after which he "immediately" determined that the object on the tracks was a person. At his deposition, however, he testified that he no longer had the broken binocular in his possession.

In July 2019, Arreola served a discovery request on Union Pacific to produce the broken binocular that Diaz had stated he used on the day of the accident, and in its response a month later, Union Pacific replied: "None within Defendants' possession, custody, or control. Defendants continue to look for responsive items and will produce them if they are found." Subsequently, in September 2019, Arreola filed a motion for spoliation of evidence, alleging that Union Pacific had intentionally and negligently failed to preserve the broken binocular, which Union Pacific knew or should have known would be material and relevant to Arreola's claim. Soon after, on October 9, 2019, Union Pacific's counsel emailed Arreola's attorneys informing them that Diaz had found the missing "binocular," and that it was available for their inspection. The email contained photographs of a Bushnell binocular, which appeared to have been broken in half.[19]

In November 2019, Arreola's attorney filed a supplemental motion for a spoliation instruction, arguing that Union Pacific had "offered no justification for not producing the binoculars in a timely manner," and insinuating that Union Pacific had produced the wrong binocular—a professional-level binocular—rather than the toy one that Diaz had referenced in his deposition testimony. The motion alleged that Union Pacific had thereby "intentionally and negligently spoliated" the evidence. As a sanction for Union Pacific's conduct, Arreola again requested that the trial court give the jury a spoliation instruction, allowing the "jury to presume the spoliated evidence is unfavorable to the Defendants." The trial court did not expressly rule on the motion before trial, but impliedly did so when it issued a written post-trial order denying all of Arreola's motions for sanctions.

At trial, in response to questioning by Arreola's attorney, Diaz explained that although he at first informed Union Pacific that he had thrown away the broken binocular after the accident,

---

[19] In her brief, Arreola calls the Bushnell binocular a "professional level monocular," but the images in the record appear to indicate that it was a binocular broken in half. We therefore call it a binocular.

he later found the binocular in "an old bag" that he believed had been discarded after the accident. He gave the binocular to Union Pacific sometime in 2019. Arreola's attorney then moved to admit into evidence the Bushnell binocular that Union Pacific had earlier produced in discovery. Arreola's attorney subsequently questioned Diaz on how the Bushnell binocular did not match the description of the binocular that he had given at his deposition. Diaz, however, confirmed that the Bushnell binocular was in fact the "toy" one he had borrowed from his stepdaughter, and that it was useful in helping him spot Molinar on the tracks. Arreola did not pursue the issue further at trial, and in particular, she did not renew her request for a spoliation instruction on the binocular during the jury charge conference, and did not submit a proposed written instruction for the court's consideration on this issue.

## B. The Admission of the Binocular

On appeal, Arreola first contends that the trial court erred by "permitting Union Pacific to introduce the professional monocular into evidence," given Union Pacific's delay in producing the binocular and its alleged substitution of a "professional grade monocular" for the "lost toy" binocular that Diaz testified at his deposition he had used on the day of the accident. But it was Arreola (and not Union Pacific) that moved to admit the Bushnell binocular into evidence. Under the invited error doctrine, "a party cannot complain on appeal that the trial court took a specific action that the complaining party requested." *Tittizer v. Union Gas Corp.*, 171 S.W.3d 857, 862 (Tex. 2005) (per curiam); *see also Meyers v. 8007 Burnet Holdings, LLC*, 600 S.W.3d 412, 422 (Tex.App.--El Paso 2020, pet. denied) ("Under what is termed the invited error doctrine, a party cannot complain on appeal about an action that the trial court took at the request of the complaining party."). Accordingly—regardless of whether Arreola believes that Union Pacific produced the

32

wrong binocular during discovery proceedings—she cannot now complain that the trial court erred in allowing its admission at trial, as she was responsible for requesting its admission.

### C. The Failure to Give a Spoliation Instruction

Arreola next contends that the trial court erred in denying her motion for a spoliation instruction, making a two-fold argument. First, she again accuses Union Pacific of intentional spoliation by engaging in what she describes as a "bait-and-switch" tactic in response to her discovery request, by producing the "professional" grade Bushnell binocular, rather than the toy binocular that Diaz described at his deposition. Second, she argues that the delay in producing the binocular amounted to an intentional concealment of the evidence, causing her to be unable to inspect the binocular before trial. Further, she argues that the binocular constituted a "critical" piece of evidence, contending that the "caliber of those binoculars was vital information" in determining how soon the train crew spotted—or should have spotted—Molinar. She claims this was a "central issue at trial." We find several problems with her arguments.

Initially, Arreola failed to tender a proposed instruction in the trial court, and further failed to address the issue at the jury charge conference. Rule 278 of the Texas Rules of Civil Procedure expressly provides that the "[f]ailure to submit a definition or instruction shall not be deemed a ground for reversal of the judgment unless a substantially correct definition or instruction has been requested in writing and tendered by the party complaining of the judgment." TEX.R.CIV.P. 278. This rule has repeatedly been interpreted to mean that a purported error about an omitted jury instruction is deemed waived absent a written tender of the instruction, and that an objection to the lack of an instruction cannot preserve error on the issue. *See Woods v. Crane Carrier Co., Inc.*, 693 S.W.2d 377, 379 (Tex. 1985) (finding that appellant's failure to properly request a special issue instruction in writing was fatal to this point of error on appeal.); *Lopez v. S. Pac. Transp.*

*Co.*, 847 S.W.2d 330, 333 (Tex.App.--El Paso 1993, no writ) (finding appellant's objection to the lack of an instruction on certain evidentiary presumptions, did not preserve error where appellant failed to tender a proposed written instruction for the court's consideration as required by Rule 278). As our sister court in Waco pointed out, despite the general rule that a party need only bring an issue to the court's attention to preserve an issue for review, every Texas court addressing the issue has declined "to relax the requirement of Rule 278 that a written request must be made" for a jury instruction to preserve the issue for appellate review. *See In re F.L.R.*, 293 S.W.3d 278, 281-82 (Tex.App.--Waco 2009, no pet.) (collecting cases).

While Arreola argued in her "supplemental motion for spoliation of evidence" that the trial court should provide the jury with a spoliation instruction pertaining to the binocular, she did not provide the court with a proposed instruction, or even explain how she believed the instruction should be worded. In addition, Arreola did not raise this issue at the charge conference or otherwise object that the charge lacked the spoliation instruction before it was read to the jury.[20] *See generally* TEX.R.CIV.P. 272 (all objections to a jury charge not presented to the trial court before reading the charge to the jury "shall be considered as waived"). We thus conclude that Arreola failed to preserve the issue of the trial court's alleged error in failing to include a spoliation instruction for the binocular in the jury charge.

Moreover, even if we were to find that Arreola preserved the issue, we would not find that a spoliation instruction would have been proper under these circumstances. In order to find that a spoliation occurred, the trial court must find that the spoliating party had a duty to preserve the evidence and that it breached that duty by failing to either preserve the evidence, or by concealing it from the nonspoliating party. *Petroleum Sols., Inc.*, 454 S.W.3d at 488-89; *Brookshire Bros.*,

---

[20] At the charge conference, Arreola's attorneys raised the issue of the court's failure to give a spoliation instruction about the horn but did not do so for the binocular.

438 S.W.3d at 23-24. Here, although the binocular was material evidence, the record does not support a finding that Union Pacific breached its duty to preserve the binocular or that it otherwise concealed it from Arreola. As explained above, Union Pacific first informed Arreola that the binocular was missing but that Union Pacific was continuing to search for it. Upon finding it, Union Pacific produced the binocolar for inspection over a month before trial. Union Pacific's initial inability to locate the binocular, which caused a delay in its production, is simply not the equivalent of a spoliation. *See generally Mattar v. BBVA Compass Bank, NA*, No. 13-16-00496-CV, 2018 WL 2440382, at *10 (Tex.App.--Corpus Christi May 31, 2018, no pet.) (mem. op.) (trial court did not err in refusing to give a spoliation instruction where the record reflects that the defendant either could not locate the documents requested by plaintiffs despite its best efforts, or that the defendant produced the documents even if in a different form than requested); *see also Christerson v. Speer*, No. 01-16-00469-CV, 2017 WL 1520449, at *7 (Tex.App.--Houston [1st Dist.] Apr. 27, 2017, pet. denied) (mem. op.) (finding that the trial court did not err in rejecting a request for a spoliation instruction because the record showed that, "after a thorough search" the parties were unable to find a missing promissory note, and there was no evidence it had been intentionally destroyed).

Further, while Arreola accuses Union Pacific of engaging in "gamesmanship" by delaying the production of the binocular, and by allegedly making a "misrepresentation of the type and quality" of the binocular Diaz used, the record reflects that Diaz provided uncontradicted testimony at trial explaining the delay and expressly explaining that he did in fact use the Bushnell binocular that Union Pacific produced during discovery. While Arreola may not believe Diaz's testimony, it was up to the trial court to assess Diaz's credibility in determining whether he was speaking the truth on this matter. *See generally EJ Madison, LLC v. Pro-Tech Diesel, Inc.*, 594

35

S.W.3d 632, 639 (Tex.App.--El Paso 2019, no pet.) (recognizing that the trial court is the sole judge of the credibility of the witnesses and the weight to be given to their testimony); s*ee also McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986) (trier of fact "may resolve inconsistencies in the testimony of any witness").

In addition, we fail to see how the delay in producing the binocular deprived Arreola of her ability to present her claim to the jury or otherwise prejudiced her case. As explained above, Union Pacific informed Arreola over a month before trial that it had found the binocular and sent photographs of the binocular to her attorneys. Arreola did not ask to inspect the binocular at that time, and she does not explain how an inspection of the binocular would have assisted her case. Moreover, it was undisputed that Diaz spotted Molinar on the tracks by using the binocular. If anything, he would have spotted Molinar sooner by using the "professional" grade binocular, rather than the "toy" one he described at his deposition.[21] Thus, the trial court acted properly in refusing to give a spoliation instruction under these circumstances.

Finally, Arreola complains for the first time in her reply brief that the "jury should have been told about Diaz's original testimony" at his deposition in which he claimed that he had used a "toy" binocular to spot Molinar on the tracks, rather than the professional grade binocular that was introduced at trial. Arreola, however, may not raise a new issue for the first time in a reply brief. *See Watret v. Watret*, 623 S.W.3d 555, 563-64 (Tex.App.--El Paso 2021, no pet.), *citing* TEX.R.APP.P. 38.3. Even at that, Arreola's attorneys did question Diaz at trial—albeit briefly— about the contradictions in his deposition testimony. She does not identify any additional testimony that she sought to elicit, but was denied admission. *See Rhey v. Redic*, 408 S.W.3d 440, 458

---

[21] When questioning Diaz, Arreola's attorney appeared to recognize as much, when she asked him: "And you had a little bit of an advantage over Mr. Harkness because you had [the Bushnell binocular]?" to which Diaz responded in the affirmative. As well, during closing arguments Arreola's attorney stated that Diaz had a "[v]ery, very good brand" of binocular—rather than a "toy" one—that let him immediately see that there was a person walking on the tracks.

36

(Tex.App.--El Paso 2013, no pet.) ("To preserve error concerning the exclusion of evidence, the complaining party must actually offer the evidence and secure an adverse ruling from the court."); TEX.R.APP.P. 33.1(a).

Arreola's Issue Two-A is overruled.

## VII. CORPORATE REPRESENTATIVE TESTIMONY

In Issue Two-B, Arreola contends that the trial court erred by limiting the testimony of one of Union Pacific's designated corporate representatives, William Spaar, about the "cause and manner of the accident." We agree with Union Pacific, however, that the trial court's ruling was not error. Further, in any event, the evidence was cumulative of other evidence presented at trial. And its exclusion, even if erroneous, did not impact the jury's verdict or otherwise prejudice Arreola's case.

### A. Background

In response to Arreola's discovery request to designate a corporate representative to testify on a list of topics, Union Pacific informed Arreola that there was not one single individual who could testify on all those topics. Union Pacific thereafter designed various individuals, including Spaar, who at the time was a manager in Union Pacific's risk management division, to serve as its corporate representatives, and agreed to allow Arreola to depose Spaar before trial. At his deposition, Spaar testified that he had been designated to testify on several topics, including "topic five," which asked Union Pacific to "describe how the occurrence happened, giving all events in detail in the order in which they occurred, before, at the time of, or after the occurrence, which had any bearing on the cause and manner of the happening of the occurrence." Spaar then testified briefly to the events that occurred that day and provided testimony consistent with Union Pacific's theory of the case.

37

Later, at a pretrial hearing, Union Pacific argued that Spaar should not have to testify on topic five at trial, or any topics relating to "train handling" as he was in the "claims department" and these topics were therefore not within his area of knowledge or expertise. Instead, Union Pacific suggested that its other designated corporate representatives could fulfill that role. Although the trial court did not expressly rule on the issue, it ordered Spaar to appear for trial, but cautioned that he would be permitted only to testify on matters within his "area[s] of knowledge." Union Pacific later withdrew its designation of Spaar as its representative on these topics, and on the first day of trial, the court ruled that—although Spaar had testified at his deposition on those topics—he would not have to do so at trial.

Despite this limitation on his testimony, the trial court allowed Arreola to question Spaar— over Union Pacific's objection—regarding whether he believed the train crew reacted properly when they spotted Molinar on the tracks.[22] In response, Spaar provided similar testimony to that in his deposition, testifying that it was "reasonable to assume people will move" off the tracks when a train is approaching, and that he believed the train crew properly engaged the emergency brake as soon as they realized that Molinar was not responding to the train's warning. Although he acknowledged that the train crew arguably could have applied the emergency brakes immediately after spotting Molinar on the tracks, he believed the crew would not have been able to stop the train before impact had they done so.

After Spaar finished testifying, Arreola's attorneys made an "offer of proof" submitting Spaar's deposition testimony. They argued that the deposition supported their position that Spaar

---

[22] The trial court sustained one objection to Arreola asking Spaar if he could "imagine a circumstance that warrants hitting the emergency brake more than a pedestrian walking away from the train with their back to the train?" The trial court agreed with Union Pacific that this was not within Spaar's field of expertise and that he did not provide any testimony to that effect during his deposition.

was in fact designated to testify on topic five and on safe train handling techniques, and that he should have been permitted to testify at trial on these topics.[23] In addition, her attorneys argued that Spaar should have been permitted to testify at trial on other subjects, such as "other instance[s] of trespassers or people on or near the tracks," as well as Union Pacific's policy on how its crews are to handle situations in which persons are spotted on the tracks. The trial court, however, declined to alter its ruling limiting Spaar's testimony.

### B. Analysis

Arreola contends that because Union Pacific designated Spaar to testify on most of the topics at issue in the case (and allowed him to testify to those topics at his deposition), the trial court erred by restricting Spaar's trial testimony to "just those subjects that Spaar claimed to know something about." In particular, Arreola contends that Spaar should have been permitted to testify about topic five and "safe train handling" techniques.

We could agree in general that when a corporation designates a representative to testify on a certain subject, it must prepare that representative to testify on that subject even if the subject is not within the representative's personal knowledge. *See Brazos River Auth. v. GE Ionics, Inc.*, 469 F.3d 416, 433-35 (5th Cir. 2006) (discussing federal rule, which limits the scope of such testimony to matters within the "corporate knowledge of the organization"); *see also Network Multifamily Sec. Corp. v. Homes for Am. Holdings, Inc.*, No. 3:10-CV-1981-M-BH, 2012 WL 13093946, at *4 (N.D. Tex. Aug. 29, 2012) (same). Here, however, the record shows that Union Pacific withdrew

---

[23] In their offer of proof, Arreola's attorneys argued, among other things, that Spaar testified at his deposition that the train crew had used the "wrong horn pattern" in alerting Molinar to the approaching train and Arreola repeats that argument in her brief on appeal. Our review of the record, however, shows that Spaar never testified that the train crew used the wrong horn pattern during his deposition. Instead, when asked if Union Pacific had a rule requiring the crew to have used a staccato pattern to alert Molinar, he responded: "I'm not sure if that's in the rule or not," and that he believed it was a "judgment call . . . for the train crew to do what they can to try to alert someone." He did, however, acknowledge that using a short succession "could in some cases" be more likely to get a person's attention, but that he did not know if it would have been more effective in Molinar's case.

any designation that it made for Spaar to testify on those topics prior to trial and instead designated two other corporate representatives to testify on those issues, both of whom provided extensive testimony at trial in their respective areas of expertise. First, Michael Shindo, who works as a trainer for Union Pacific, testified at length about safe train handling techniques, and the proper protocol to follow when a person is discovered on the tracks. In addition, as set forth above, Mark Pollan testified in detail on topic five. Providing other corporate representatives to adequately cover these topics at trial fulfilled any duty that Union Pacific had to ensure that a qualified representative provided testimony on the requested issues. *See generally Brazos River Auth.*, 469 F.3d at 433 (recognizing that when a designated representative is unable or unwilling to testify on a certain subject, a corporation may comply with its duty by "designat[ing] another witness with personal or corporate knowledge of the questions asked").

Finally, as Union Pacific points out, even if the trial court erred in limiting Spaar's testimony, nothing in the record suggests that Arreola was harmed by the trial court's ruling such that it warrants reversal of the judgment. Union Pacific tendered two other corporate representatives who testified extensively on those subjects, and any testimony Spaar could have given would have been cumulative, thereby rendering the exclusion of his testimony harmless. *See Gunn v. McCoy*, 554 S.W.3d 645, 668 (Tex. 2018) (recognizing that the improper exclusion of evidence is "likely harmless if the evidence was cumulative or if the rest of the evidence was so one-sided that the error likely made no difference in the judgment"). Spaar did not provide any testimony at his deposition that would have favored Arreola's case. On the contrary, his deposition testimony supported Union Pacific's defense that the crew acted reasonably in handling the situation when they first observed Molinar on the tracks, and that the outcome would not have been altered even if the crew had engaged the emergency brakes sooner. Moreover, Spaar testified

at his deposition that he placed "all fault" on Molinar in causing the accident by walking on the railroad tracks wearing headphones. Accordingly, even if Arreola had been able to question Spaar more extensively about the issues in question, his testimony would not have helped her case.

Arreola's Issue Two-B is overruled.

## VIII.   THE APPLICABLE STANDARD OF CARE

In Issue Three, Arreola contends that the trial court erred in rejecting her requested jury instruction that in determining the percentage of negligence, Molinar should be held to the standard of a reasonably prudent individual of his same age—that is, a sixteen-year-old. According to Arreola, Texas law requires that a minor be held to the degree of care that would be exercised by an ordinarily prudent child of the same age, intelligence, experience, and capacity under the same or similar circumstances, unless he was engaged in an adult activity that created a danger to third parties. This, however, is not a correct statement of the law.

### A.   Applicable Law

In general, Texas law provides that a child is held to the same degree of care that would be exercised by an "ordinarily prudent child of [the same] age, intelligence, experience and capacity . . . under the same or similar circumstances." *See, e.g.*, *Nabors Well Servs., Ltd. v. Romero*, 456 S.W.3d 553, 564 (Tex. 2015); *see also Rudes v. Gottschalk*, 324 S.W.2d 201, 206-07 (1959) (recognizing that "ordinary care" as applied to a minor "may be defined as such care as an ordinarily prudent child of the age, intelligence, experience and capacity of the [the minor plaintiff] would have exercised under the same or similar circumstances"). Yet long ago, the Texas Supreme Court bracketed the rule, treating very young and older children differently. That is, at times a child might be too young to be capable of negligence, while, on the other hand, a child in the "later years of minority," such as a 16-year-old—or perhaps even a child as young as 14—may be

41

presumed to have the capacity and discretion of an adult absent any evidence to the contrary. *See Dallas Ry. & Terminal Co. v. Rogers*, 218 S.W.2d 456, 461 (1949) (recognizing that while a very young child, such as a three-year-old, is presumed to be incapable of contributory negligence, a child in the later years of minority, for example sixteen years old may be "presumed prima facie to have the capacity and discretion of an adult," and be judged by that standard without any evidence to rebut the presumption), *citing Seinsheimer v. Burkhart*, 122 S.W.2d 1063, 1065 (Tex. Comm'n App. 1939). Our sister courts that have directly addressed the issue have uniformly held that 16-year-old children should be judged by an adult standard of care in determining their negligence unless there is evidence of a mental deficiency or other factors that would render an adult application improper. *See, e.g.*, *Barnes v. Zinda*, 464 S.W.2d 501, 504 (Tex.App.--Waco 1971, writ ref'd n.r.e.); *Renegar v. Cramer*, 354 S.W.2d 663, 676 (Tex.App.--Austin 1962, writ ref'd n.r.e.); *Ambrose & Co. v. Booth*, 301 S.W.2d 223, 225 (Tex.App.--Fort Worth 1957, writ ref'd n.r.e.); *see also City of Austin v. Hoffman*, 379 S.W.2d 103, 107-08 (Tex.App.--Austin 1964, writ dism'd by agr.) (holding that a child of 14½ years should be held to an adult standard of care absent any showing that the child labored under a mental disability).

Arreola argues that we should reconsider this rule, pointing out that the Texas Supreme Court cases holding that a child in the later years of maturity may be held to an adult standard of care are over 50 years old, and arguing that the "modern" view—expressed by courts in other jurisdictions—does not apply an adult standard of care to cases involving minors. We decline to do so. While the Texas Supreme Court cases addressing this issue may be old, that court has not deviated from its earlier pronouncement drawing an age distinction for determining the appropriate standard of care. And regardless of what other jurisdictions may do—an issue over which the parties disagree—as an intermediate appellate court, we may not ignore Texas Supreme Court

precedent until it is overruled either by the high court or the Texas Legislature. *Lubbock County v. Trammel's Lubbock Bail Bonds*, 80 S.W.3d 580, 585 (Tex. 2002) (recognizing that "[i]t is not the function of a court of appeals to abrogate or modify established precedent" as that function lies solely with the Texas Supreme Court); *Texas Dep't of Family & Protective Servs. v. Parra*, 503 S.W.3d 646, 657-58 (Tex.App.--El Paso 2016, pet. denied).

### B. Analysis

At trial, Arreola presented no evidence that Molinar had any mental deficiency or that he otherwise lacked the capacity to act as an adult. The only evidence at trial on the level of Molinar's maturity came from Arreola's testimony in which she testified that although he could be "immature" for his age, he had no learning disabilities, and was like a "mini counselor" to her, providing support and reassurance when she was having a "bad day." Accordingly, we conclude that the trial court did not err in refusing to give a jury instruction that would have directed the jury to determine Molinar's negligence by a non-adult standard of care.

Arreola's Issue Three is overruled.

## IX. EXCLUSION OF THE PRIOR ACCIDENT

In Issue Four, Arreola contends that the trial court erred in refusing to allow her to introduce evidence of a prior fatal accident that occurred in 2011, when 14-year-old Justin Alcantar was walking on the tracks and failed to heed the warning given by a Union Pacific freight train, leading to his death (the Alcantar accident). Arreola contends that evidence of the Alcantar accident was "highly probative" to her case, as it supported her theory that the train crew could have foreseen that they might encounter a teenager on the train who would fail to heed the train's warning, and that they therefore should have immediately engaged the emergency brakes when they observed

that Molinar was walking on the tracks to avoid another fatality. We find no abuse of discretion in the trial court's decision to exclude this evidence.

## A. Applicable Law

In a negligence case, evidence of prior accidents may be admissible if they are relevant to contested issues in the case. *See Nissan Motor Co. Ltd. v. Armstrong*, 145 S.W.3d 131, 138 (Tex. 2004) (recognizing that proof of prior accidents may be admissible to show that a railroad crossing was "extra-hazardous" or that a product is "unreasonably dangerous"). But to be admissible, the prior accidents must have occurred under reasonably similar (though not necessarily identical) conditions because proof of what happened in a prior accident does not, by itself, prove what happened in the current one. *Id.*; *see also Missouri Pac. R.R. Co. v. Cooper*, 563 S.W.2d 233, 236 (Tex. 1978) (in a negligence case, evidence of prior similar accidents is generally admissible if the "earlier accidents occurred under reasonably similar but not necessarily identical circumstances"). "'Reasonably similar' generally means the same type of occurrence." *In re Sun Coast Res., Inc.*, 562 S.W.3d 138, 148 (Tex.App.--Houston [14th Dist.] 2018, no pet.). The proponent of the evidence bears the burden of proving that the incidents are reasonably similar. *Columbia Med. Ctr. Subsidiary, L.P. v. Meier*, 198 S.W.3d 408, 411-12 (Tex.App.--Dallas 2006, pet. denied).

A trial court may decline to admit evidence of prior accidents if it concludes that their admission would create "undue prejudice, confusion, or delay," because prolonged proof of what happened in other accidents cannot be used to distract a jury's attention from what happened in the case at hand." *Armstrong*, 145 S.W.3d at 138; *see also N. Am. Van Lines, Inc. v. Emmons*, 50 S.W.3d 103, 125 (Tex.App.--Beaumont 2001, pet. denied); *see generally* TEX.R.EVID. 403 (court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of

one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence"). As the Texas Supreme Court has cautioned, a trial court must "carefully consider the bounds of similarity, prejudice, confusion, and sequence," before admitting evidence of prior accidents. *Waldrip*, 380 S.W.3d at 132-33.

And finally, because the prior accidents must be relevant to the issues in the case, the court must consider the purpose for which they are being offered, as prior accidents may be admissible for some purposes but not others. *Armstrong*, 145 S.W.3d at 138. In general, evidence of substantially similar prior accidents of which a defendant was aware may be admissible to demonstrate that the defendant could have foreseen the accident under consideration. *See, e.g.*, *In re Sun Coast Res., Inc.*, 562 S.W.3d at 148 (notice of prior similar incidents may strengthen a claim that an incident was foreseeable).

With these principles in mind, we measure the trial court's decision to exclude the evidence of the Alcantar accident under the abuse of discretion standard, and will only reverse the trial court's decision if it probably resulted in an improper judgment. *See JLG Trucking, LLC*, 466 S.W.3d at 161, 165.

### B.  Analysis

Arreola contends that the trial court abused its discretion in excluding evidence of the Alcantar accident, arguing that it occurred under reasonably similar conditions as Molinar's accident. She points out that both accidents occurred on the same El Paso-Alpine route, at the same approximate time of day and year—a sunny afternoon in late summer, and both accidents involved teenagers walking on the train tracks who failed to heed the train's warning.[24] According to

---

[24] Although Arreola contends that Alcantar was found with earbuds in his possession, we find nothing in the current record or in our prior opinion that resolved a mandamus in that case, to substantiate that fact. *See In re Union Pac. R.R. Co.*, 459 S.W.3d 127 (Tex.App.--El Paso 2015, orig. proceeding).

Arreola, evidence of the Alcantar accident was relevant to demonstrate that encountering teenagers on the tracks along this route was not an "isolated incident," and that it was foreseeable that a teenager might not respond to a train's warning, thereby supporting her theory that the train crew was negligent by not immediately engaging the emergency brakes when they first spotted Molinar on the tracks to avoid another fatality.

Although Union Pacific points out some differences between the two accidents, we assume without deciding that the accidents were substantially similar. Nor do we find it necessary to disagree with Arreola's argument that the Alcantar accident was relevant to her theory of the case—that it was foreseeable to the train crew that they could have encountered a minor walking on the track who would not hear or otherwise respond to the horn blowing.

Instead, the key issue for our consideration is whether the trial court abused its discretion in determining that admitting evidence of the Alcantar accident would have been unduly distracting and confusing to the jury. In ruling that the evidence was inadmissible, the trial court expressly found that its admission would likely have resulted in a battle over fault in that accident, as Union Pacific would have no doubt attempted to prove it was not at fault in Alcantar's death, leading to a prolonged presentation of the facts in that case. And the court further feared that this would have effectively resulted in the parties trying both cases at the same time. As the trial court recognized, to compare the two events the parties would have been required to provide additional evidence on several issues, including the type of train that was involved in the Alcantar case, whether it was carrying dangerous chemicals, whether there was a possibility of derailment in that case, how fast the train was going, whether it could have stopped before hitting Alcantar if the

46

emergency brakes had been applied sooner, the configuration of the tracks, and the type of horn on the train, as well as how the horn was blown.[25]

Arreola, however, contends that the evidence of the Alcantar accident was so highly relevant to her case that the trial court should have admitted the evidence despite the possibility that it would distract the jury's attention away from the issues in Molinar's case. In support of her argument, she relies on *Missouri-Kansas-Texas R.R. Co. v. May*, in which the court ruled that evidence of prior accidents at a particular railroad crossing was highly relevant to the issue of whether the crossing could be considered "extra-hazardous." 600 S.W.2d 755, 756 (Tex. 1980) (per curiam). The *May* court concluded that the exclusion of such evidence "was reasonably calculated to cause and probably did cause the rendition of an improper judgment in the case," thereby warranting reversal of the case. *Id.* But *May* is inapt because Arreola did not seek to admit the Alcantar accident to show the tracks here were "extra-hazardous." As Union Pacific points out, the Alcantar accident happened over 180 miles away and Arreola never argued at trial that the entire length of the El Paso-Alpine line was somehow unreasonably dangerous. Instead, Arreola sought admission of the prior accident to establish that Union Pacific should have foreseen that a teenager might be walking on the tracks and might not heed a train's warnings. Yet at trial, Union Pacific did not dispute that its train crews often encountered trespassers walking on the tracks. Instead, its defense was that it was reasonable for its crews to assume that those individuals will extricate themselves from the track with a timely warning—despite the fact that there are rare times this does not occur. We therefore conclude that the trial court did not abuse its discretion in

---

[25] Arreola contends that any danger of confusion or prejudice could have been avoided by giving the jury a "limiting instruction restricting the jury's consideration of the Alcantar incident to Union Pacific's notice of the dangers on this particular route," *citing John Deere Co. v. May*, 773 S.W.2d 369, 374 (Tex.App.--Waco 1989, writ denied) (limiting instructions restricting the jury's use of extraneous incidents to the issue of whether the defendant had notice of the defective design of its tractor reduced the possibility of any prejudice occurring due to the admission of the evidence). Arreola, however, did not suggest at trial that the court could provide any such instruction, and has therefore waived this issue on appeal.

determining that any probative value the evidence had was outweighed by the possibility that the admission of the evidence would have been unduly distracting and confusing to the jury.

Arreola's Issue Four is overruled.

## X.  CUMULATIVE ERROR

In Issue Six, Arreola contends that the trial court committed "multiple erroneous" rulings, and that even if the errors did not independently warrant reversal of the trial court's judgment, considered together, they constituted cumulative error that was reasonably calculated to cause the rendition of an improper judgment. Arreola correctly points out that a reviewing court may reverse a trial court's judgment under the so-called "cumulative-error" doctrine when the appellant can demonstrate that, but for the trial court's multiple errors, the jury would have rendered a verdict favorable to her. *See, e.g.*, *Rhey*, 408 S.W.3d at 462 (recognizing that a reviewing court may reverse a lower-court judgment under the cumulative-error doctrine when the record shows many instances of error, no one instance being sufficient to call for reversal, yet all the instances taken together may do so); *see also Lakeside Vill. Homeowners Ass'n, Inc. v. Belanger*, 545 S.W.3d 15, 46 (Tex.App.--El Paso 2017, pet. denied) ("When several errors exist but are not considered reversible, all errors considered together could present cumulative error requiring reversal.").

But as set forth above, we have not found that the trial court committed multiple errors in its rulings, and we have therefore overruled all of Arreola's issues. As a result, we find no cumulative error on this record. *See Rhey*, 408 S.W.3d at 462 (there can be no cumulative error where court overruled appellant's issues on appeal).

Arreola's Issue Six is overruled.

48

## XI. THE TRIAL JUDGE'S ALLEGED BIAS

In Issue Seven, Arreola contends that the trial court judge exhibited a "biased demeanor" toward her attorneys in the jury's presence, as reflected in the court's "numerous rulings and comments," which Arreola contends "rewarded Union Pacific's discovery abuse" and exhibited a "disdain" for her attorneys. According to Arreola, the judge verbally confronted her attorneys and displayed displeasure toward them in the jury's presence, making it clear that she lost her ability to act in a fair and impartial manner, and thereby depriving her of the right to a fair trial. For the reasons below, we disagree.

### A. Standard of Review and Applicable Law

Critical to our justice system is the fundamental precept that all parties have a right to a fair and impartial trial before a neutral and detached judge. *See generally Ward v. Vill. of Monroeville, Ohio*, 409 U.S. 57, 61-62, (1972) (finding that defendant who stood trial for traffic offense was deprived of his right to a "neutral and detached judge" where judge was mayor of the city and had an interest in collecting fines against traffic offenders); *see also Markowitz v. Markowitz*, 118 S.W.3d 82, 86 (Tex.App.--Houston [14th Dist.] 2003, pet. denied) (recognizing a party's right to a trial in front of a "neutral and detached judge"). The Texas Supreme Court, however, has recognized that adverse judicial rulings alone only rarely constitute a valid basis for a claim that a judge was biased or partial in a proceeding. *See Francis*, 46 S.W.3d at 240, *citing Liteky v. United States*, 510 U.S. 540, 555 (1994); *see also Chappell v. Allen*, 414 S.W.3d 316, 329 n.5 (Tex.App.--El Paso 2013, no pet.) (same). It is only in the "rarest circumstances" that judicial rulings demonstrate the degree of favoritism or antagonism necessary to show that a fair and impartial trial was impossible. *Markowitz*, 118 S.W.3d at 87, *citing Liteky*, 510 U.S. at 555. Such rulings are instead generally best brought as grounds for appeal, not as evidence of judicial

bias. *Id.* at 87-88*, citing Liteky*, 510 U.S. at 555; *Grider v. Boston Co.*, 773 S.W.2d 338, 346 (Tex.App.--Dallas 1989, writ denied) ("proper remedy was to assign error on the basis of the adverse rulings"); *see also Ellason v. Ellason*, 162 S.W.3d 883, 887 (Tex.App.--Dallas 2005, no pet.) (recognizing that rulings about which a party disagrees are "best brought as grounds for appeal rather than evidence of judicial bias").

While we recognize that a trial judge should refrain from verbally confronting or displaying displeasure toward counsel, particularly in the presence of the jury, the Texas Supreme Court has held that judges have broad discretion in conducting a trial and in expressing themselves in exercising this discretion. *Francis*, 46 S.W.3d at 240; *see also Holmes v. GMAC, Inc.*, 458 S.W.3d 85, 93 (Tex.App.--El Paso 2014, no pet.). Thus, remarks made by the judge "during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." *Francis*, 46 S.W.3d at 240, *quoting Liteky*, 510 U.S. at 555 (internal quotation marks omitted). As well, the court has recognized that "expressions of impatience, dissatisfaction, annoyance, and even anger" do not establish bias or partiality," and that even "a stern and short-tempered judge's ordinary effort at courtroom administration . . . remain immune" from a claim of bias. *Id.*, *citing Liteky*, 510 U.S. at 555-56. Instead, to warrant a finding of improper juridical bias, a judge's comments must be so extreme that they demonstrate "a deep-seated favoritism or antagonism that would make fair judgment impossible." *Holmes*, 458 S.W.3d at 93, *quoting Francis*, 46 S.W.3d at 240; *see also Chappell*, 414 S.W.3d at 329 n.5 (same). And when a party claims on appeal that a judge's remarks reflect a bias that warrants reversing a judgment, the appellate court must consider the trial court's allegedly improper comments in the context of the entire record, and determine whether the record reflects such a bias. *Francis*, 46 S.W.3d at 240-41 (court found no evidence of judicial bias, as a matter of

law, after "carefully examining the judge's allegedly improper comments in the context of the entire record").

In addition, the Texas Supreme Court has held that a party must preserve a complaint about allegedly improper judicial comments by making an objection when the comments occur, and by requesting a curative instruction—unless the conduct or comment is so prejudicial that it cannot be rendered harmless by proper instruction. *Id.* at 241 (finding that the court of appeals erred in sustaining party's allegations of judicial bias where party failed to preserve error and did not explain how the comments were incurable); *see also Capellen v. Capellen*, 888 S.W.2d 539, 546-47 (Tex.App.--El Paso 1994, writ denied) (recognizing that absent an objection, ruling, and request for an appropriate instruction, only a comment of such a prejudicial and harmful character as to be considered incurable will be preserved). Thus, the party that is claiming bias, without making a timely objection, has the burden to "explain how any comments made by the trial judge were incurable or would excuse" the claimant's "failure to preserve error." *In re Commitment of Stuteville*, 463 S.W.3d 543, 557 (Tex.App.--Houston [1st Dist.] 2015, pet. denied) (citation omitted); *see also Interest of B.A.*, No. 02-21-00278-CV, 2022 WL 247558, at *6 (Tex.App.--Fort Worth Jan. 27, 2022, pet. denied) (mem. op.) (same).

## B. Analysis

Arreola complains on appeal about both the trial judge's rulings, and various comments that the judge made when making her rulings. Yet as explained above, we have already concluded that the judge did not err in the rulings challenged on appeal and we therefore can summarily reject the argument that those rulings reflected a bias. In addition, Arreola never objected in the trial court to any of the judge's allegedly improper comments, and never sought a curative instruction for the judge's allegedly improper remarks. Thus, to demonstrate that the trial judge exhibited a

51

reversible bias against her, Arreola bore the burden of establishing that the remarks were so prejudicial and harmful to her case that a curative instruction would not have cured any harm caused by them. We examine each of the trial court's complained of comments and rulings in turn.

First, Arreola points to an exchange that occurred after one of her attorneys became upset when—as discussed above—he learned during trial that Union Pacific had not produced the original horn for testing by Dr. Seidemann, and he referred to the Union Pacific employee responsible for the alleged "deception"—or possibly its attorney—as being "a sneak." In response, the trial judge warned counsel—outside the presence of the jury—that she would not tolerate name-calling or engaging in disparagement of others in her court. Shortly thereafter, when Arreola's attorney was questioning Dr. Seidemann, he suggested that Union Pacific's attorney had "not let" Dr. Seidemann review certain materials on cross-examination. Union Pacific objected and in response, the judge then stated in the jury's presence: "Didn't we have a little talk about not disparaging or making personal attacks on the other side?" Arreola did not object to the judge's comment at that time or request a curative instruction, and instead replied: "Yes, I can move on." Arreola, however, now argues that this comment reflected such a high degree of bias against her attorney that it constituted incurable error such that we should overlook her failure to object. We disagree. The judge made the comment in the context of responding to Union Pacific's objection, and in an ongoing attempt to maintain control and decorum over the proceedings. The comment was thus within the permissible scope of the judge's discretion and did not reflect the type of "deep-seated favoritism or antagonism that would make fair judgment impossible." *Francis*, 46 S.W.3d at 240.

Second, Arreola points to a passage in the record in which her attorney was questioning William Spaar about statements on Union Pacific's website on horn protocol, which had had not

yet been admitted into evidence. Following Union Pacific's objection, the trial court admonished Arreola's counsel not to read from the website until it was admitted into evidence, and when counsel continued to question Spaar about the statements on the website, the following colloquy ensured:

> THE COURT: You're reading from the document. Just for the record, you're reading from the document that I've not allowed to be admitted, correct? That's what you're doing?
>
> MS. SCHERR: I'm asking about the language.
>
> THE COURT: You're reading from the document.
>
> MS. SCHERR: I can rephrase.
>
> THE COURT: But you're reading from the document that I didn't allow to be admitted.
>
> MS. SCHERR: I'm using – yes, the language from the website.
>
> THE COURT: Okay. All right.

Arreola now contends that the trial court improperly "admonished" her attorney during this exchange and thereby "tainted" the jury's view of both her and her attorney. However, we find that the judge was simply expressing her view on the propriety of counsel's line of questioning, a matter clearly within her discretion, and we see nothing improper or prejudicial in this exchange.

Third, Arreola complains that the trial judge improperly "admonished" her attorney when he tried to question William Spaar about matters that the judge had already determined were not within the scope of his area of expertise. The record, however, reflects that the judge simply informed counsel that she believed his question was outside the scope of Spaar's designation and advised counsel to ask Spaar "another question." Subsequently, when the trial court later sustained Union Pacific's objection to a second question that Arreola's attorney asked Spaar, the trial court simply stated, "Sustained. Ask your next question." We see nothing improper in the judge's ruling or in the way the judge expressed her ruling.

Fourth, Arreola complains that during the presentation of Dr. Seidemann's testimony, the trial judge made "multiple dismissive comments about [her] counsel before the jury." Although she does not specify which comments she finds offensive, she does cite several pages in the reporter's record that we have reviewed, which fail to support her claim of bias. At most, these pages reflect that the trial court simply sustained a series of objections made by Union Pacific's counsel while Arreola's attorney was questioning Dr. Seidemann. In particular, the judge sustained two objections made by Union Pacific's attorney that Arreola's counsel was leading the witness. The court also sustained two objections that Union Pacific made when Arreola's counsel sought to question Dr. Seidemann about the alleged spoliation of the horn and the train's repair records. While Arreola disagrees with the trial court's limitation of Dr. Seidemann's testimony, her decision to limit his testimony was at best an appellate issue that we have already resolved. We fail to see how it reflects any judicial bias on the court's part.

Arreola cites no cases in which courts have found that comments similar to the ones she challenges here rose to the level of uncurable judicial bias. On the contrary, in all but one of the cases that she cites, the courts found the opposite—that the party claiming bias did *not* meet his burden of establishing that the judge's comments rose to that level. *See Stuteville*, 463 S.W.3d at 558 (holding that petitioner did not explain how the trial court's comments were so "blatantly and obviously prejudicial" that any confusion or damage caused by the comments could not have been overcome by a curative instruction); *Capellen*, 888 S.W.2d at 547 (finding no incurable judicial bias where judge made comments that were at best "mildly prejudicial" and which did not warrant reversal). In the only case she cites in which a court found that a judge's comments during trial suggested an incurable bias, the trial judge in that case had commented on the weight of the evidence in front of the jury, and "indicated a disbelief in appellant's position, and implied

approval and support of the State's position," which deprived the criminal defendant of his right to a fair trial. *Simon v. State*, 203 S.W.3d 581, 591-92 (Tex.App.--Houston [14th Dist.] 2006, no pet.). *Simon*, however, does not apply, as Arreola does not contend that the trial judge in her case ever commented on the weight of the evidence, or that the judge made any express comments of approval or disapproval of the parties' respective theories in the case.[26]

In short, we find that Arreola has failed to point to any rulings or comments that the trial judge made to sustain her claim of judicial bias. We therefore conclude that she was not deprived of her right to a fair trial in front of a neutral and detached judge.

Arreola's Issue Seven is overruled.

## XII. CONCLUSION

We affirm the trial court's judgment.


JEFF ALLEY, Justice

October 19, 2022

Before Rodriguez, C.J., Palafox, and Alley, JJ.

---

[26] Arreola also cites *CNA Ins. Co. v. Scheffey*, 828 S.W.2d 785, 792 (Tex.App.--Texarkana 1992, writ denied) in support of her position, but we find this case to be inapt as well, as it involved a finding that the judge's impartiality was incurable because of an extrajudicial factor—his close relationship with one of the attorneys in the case, which called his impartiality into question. Arreola has alleged no such extrajudicial bias in this case.